Andrew C. **HOLT**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 95–CF–17.

District of Columbia Court of Appeals.

Argued March 7, 1996.
Decided April 18, 1996.

Robert C. Bonsib, Gaithersburg, for appellant.

Magdalena A. Bell, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Roy W. McLeese, III, and Eileen F. Sheehan, Assistant United States Attorneys, were on the brief, for appellee.

Before FERREN, TERRY, and RUIZ, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant Holt of assaulting a police officer with a dangerous weapon, D.C.Code § 22–505(b) (1989 Repl. & 1995 Supp.), and possession of a firearm during a crime of violence or dangerous crime (PFCV), *id.* § 22–3204(b). On appeal, Holt contends the trial court erred in (1) admitting in evidence clothing seized from Holt while he was receiving emergency medical treatment at Washington Hospital Center, (2) admitting in evidence a "showup" identification of Holt conducted at the hospital, (3) permitting the prosecutor to impeach Holt

with a prior conviction for possession of marijuana, (4) refusing to allow a requested jury instruction concerning the charge of assault on a police officer with a dangerous weapon, and (5) refusing to dismiss one of the two charged PFCV counts. We affirm.

## I.

On the night of December 17, 1993, Kevin Morris, an off-duty Metropolitan Police officer working as a security guard at 601 Edgewood Terrace, N.E., heard rapid gunfire outside the apartment complex. Officer Morris then witnessed two armed males chasing a small group of persons west on the 600 block of Edgewood Terrace. After observing the two men for twenty to thirty seconds from the rear of the apartment complex, Officer Morris went outside to watch the men, who were now running back in his direction. When both men were "three car lengths" away, Officer Morris identified himself as a police officer. One of the men turned and pointed his gun directly at Morris, who opened fire and pursued both men on foot until he lost sight of them.

After returning to 601 Edgewood Terrace, Officer Morris discovered Darnell Parker, one of the individuals who had been chased by the two gunmen, on the ground with multiple gunshot wounds. Using his police radio, Officer Morris requested an ambulance and broadcast a lookout for two black males of slender build between five feet ten inches and six feet tall, wearing dark hats, dark coats, dark pants, and dark shoes. Minutes later, Parker was taken by ambulance to Washington Hospital Center's Med–Star Unit, and two Metropolitan Police detectives who regularly patrolled the area, Gerald Rich and Macklay Lucas, arrived at the scene of the shooting.

Fifteen to twenty minutes after the Edgewood Terrace shooting, Andrew Holt admitted himself into Washington Hospital Center's emergency room with a gunshot wound to the leg. Pursuant to the practice of area hospitals, Washington Hospital Center informed the police of Holt's admission. A police dispatcher informed Detective Rich, who was investigating the scene of the shooting with Officer Morris, that a possible suspect had arrived at Washington Hospital Center. Detective Rich, in turn, contacted Detective Willie Wade, who had been assigned to monitor the condition of Darnell Parker at Washington Hospital Center, to investigate whether the suspect had received his injuries as a result of the Edgewood Terrace shooting.

Detective Wade and Officer Delacey, a police officer dispatched earlier to Washington Hospital Center, located Holt and identified themselves. At that time, Holt already had received medical treatment and was lying on a hospital gurney in the emergency room. Detective Wade, who had only limited knowledge of the circumstances surrounding the earlier shooting, asked Holt how he had been shot. When Holt replied that he had been shot at the Edgewood Terrace plaza as he was going to use a public telephone, Detective Wade instructed Officer Delacey to inspect a visible, unsealed plastic bag under Holt's gurney in which hospital personnel had stored Holt's clothing before treating him. Inside the bag, the detective discovered a black jacket, black trousers, black shoes, and other articles of clothing consistent with Officer Morris's lookout description. Wade contacted Detective Rich by police radio and advised him to bring Officer Morris to the hospital in order to view Holt.

Detective Rich informed Officer Morris on the way to Washington Hospital Center that he would be viewing a possible suspect in the shooting. According to the testimony of Detective Rich and Officer Morris, however, Rich did not inform Morris that the suspect's appearance and clothes matched Morris's earlier radio lookout. When Officer Morris arrived at the hospital, Detectives Rich and Lucas accompanied him to the room where Holt was located. Morris then went in alone to the area where Holt was lying on a gurney in his hospital smock. Officer Morris returned and told Detective Rich that Holt was the individual who earlier had pointed a gun at him. Morris then viewed Holt a second time in order to confirm the identification. After this second viewing, which lasted twenty to thirty seconds, Morris became "a hundred percent certain" that Holt was the individual who had pointed the gun

at him, because Holt's facial expression matched the "puzzled" expression Morris had seen on the gunman earlier.

Based upon Officer Morris's identification and the clothes contained in the plastic bag, Detective Rich placed Holt under arrest at the hospital. Immediately thereafter, Detective Rich obtained the bag of clothing underneath Holt's gurney from hospital personnel. At the police station, Officer Morris identified the clothes in that bag as the clothes worn by the person he had chased earlier in the evening.

On March 9, 1994, a grand jury brought a four-count indictment against Holt charging him with assault with intent to kill while armed for the shooting that took place outside 601 Edgewood Terrace, D.C.Code §§ 22–501, –3202; assaulting, resisting or interfering with a police officer with a dangerous weapon for aiming a gun at Officer Morris, *id.* § 22–505(b); and two counts of PFCV predicated on each of the first two offenses, *id.* § 22–3204(b).

Before the jury trial began on April 14, 1994, the trial court held a hearing to resolve various pretrial motions. Holt had moved to suppress the bag of clothing seized at the hospital, to suppress Officer Morris's "show-up" identification of Holt, and to dismiss the fourth count of the indictment charging Holt with PFCV based upon the assault charge. The trial court denied each motion.

At trial, the government sought to establish that Holt had fired shots outside 601 Edgewood Terrace and had pointed a gun at Officer Morris. The government's evidence included, in addition to Morris's "showup" identification and the clothes seized by the police, the testimonies of Officer Morris, of Detectives Rich, Wade, and Lucas, and of Darnell Parker. According to the defense theory, Holt innocently had been at the scene when the shooting occurred, had been wounded as he attempted to flee, and never had aimed a gun at Officer Morris. Holt, who was impeached by prior convictions for

possession of marijuana and unauthorized use of a vehicle, testified on his own behalf.

On April 27, 1994, the jury found Holt guilty of assault on a police officer with a dangerous weapon and PFCV but acquitted him of the charges attributable to the shooting that took place outside 601 Edgewood Terrace. Holt was sentenced to a term of forty months to ten years in prison for the assault and to a term of five to fifteen years for PFCV, to run concurrently with his sentence for the assault. Holt filed a timely notice of appeal.

## II.

### A.

■ Holt contends the trial court erred in admitting in evidence the clothing seized by the police at Washington Hospital Center. Our standard of review for a trial court's ruling on a motion to suppress tangible evidence requires that "the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court's ruling." *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc); *accord Powell v. United States,* 649 A.2d 1082, 1093 (D.C.1994). Factual findings will not be disturbed if supported by substantial evidence, *see United States v. Alexander,* 428 A.2d 42, 50 (D.C. 1981), and conclusions of law are reviewed *de novo. See Patton v. United States,* 633 A.2d 800, 814 (D.C.1993).

■ Holt argues, primarily, that the seizure of his bag of clothing was the "fruit of a poisonous tree," *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939), because the initial inspection of his clothing was an unlawful search. Holt's argument relies on the proposition that, but for that initial inspection, he would not have been identified and arrested at the hospital, and thus the police would not have been able to seize his clothing before he left the hospital.[1] The pivotal issue, therefore, is whether

---

1. It appears from the record that if Detective Wade and Officer Delacey had not inspected Holt's clothing and discovered that it was consistent with Officer Morris's lookout description, Detective Wade would not have asked Detective

Rich to bring Officer Morris to the hospital to view Holt on the night of the shooting. Morris's identification of Holt, whom hospital personnel were about to release, permitted Detective Rich

the inspection of Holt's clothing was an unconstitutional search requiring exclusion of the clothing from the trial under the "tainted fruits" doctrine. *See United States v. Ceccolini,* 435 U.S. 268, 273–79, 98 S.Ct. 1054, 1058–62, 55 L.Ed.2d 268 (1978); *United States v. Calandra,* 414 U.S. 338, 354, 94 S.Ct. 613, 622–23, 38 L.Ed.2d 561 (1974); *Wong Sun v. United States,* 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963); *Nardone,* 308 U.S. at 341, 60 S.Ct. at 267–68; *Patton,* 633 A.2d at 816.

Holt argues, more particularly, that the inspection of his clothing was not justified under any exception to the Fourth Amendment's warrant requirement. As a threshold matter, we must decide whether the inspection amounted to a "search" implicating Holt's Fourth Amendment rights. *See* U.S. CONST. amend. IV. It has long been the case that invocation of the Fourth Amendment depends upon whether the person seeking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that government action has invaded.

*See e.g., Minnesota v. Olson,* 495 U.S. 91, 98, 110 S.Ct. 1684, 1688–89, 109 L.Ed.2d 85 (1990) (legitimate expectation); *Florida v. Riley,* 488 U.S. 445, 450, 109 S.Ct. 693, 696–97, 102 L.Ed.2d 835 (1988) (White, J. concurring) (reasonable expectation); *United States v. Caceres,* 440 U.S. 741, 750, 99 S.Ct. 1465, 1470–71, 59 L.Ed.2d 733 (1979) (justifiable expectation); *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) (legitimate expectation); *United States v. Miller,* 425 U.S. 435, 442, 96 S.Ct. 1619, 1623–24, 48 L.Ed.2d 71 (1976) (reasonable expectation); *Junior v. United States,* 634 A.2d 411, 418 (D.C.1993) (legitimate expectation); *Brown v. United States,* 627 A.2d 499, 502–03 (D.C.1993) (reasonable expectation).[2]

■ We therefore must determine whether Holt can claim a legitimate expectation of privacy in the subject of the police inspection: the outward appearance of Holt's clothing when he admitted himself to the hospital emergency room.[3] We discern no

---

to arrest Holt and to seize his clothing in connection with that arrest.

**2.** In *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court formulated the Fourth Amendment inquiry. According to Justice Harlan's interpretive concurring opinion, before the Fourth Amendment's protections are triggered, the movant must demonstrate that he or she had an "actual (subjective) expectation of privacy" in the place searched, and that this expectation was objectively reasonable, i.e., "one that society is prepared to recognize as 'reasonable.'" *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). *See generally* 1 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 2.1(b)–(d) (1996). *Katz's* two-pronged approach was subsequently reformulated as a "reasonable expectation of privacy" test, *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968) (quoting *Katz,* 389 U.S. at 361, 88 S.Ct. at 516–17 (Harlan, J., concurring)), as reflected in the cases cited in the text. Such "reasonable" or "legitimate" expectations of privacy continue to include both the subjective and objective criteria discussed by Justice Harlan in his *Katz* concurrence. *See, e.g., Rakas,* 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430 n. 12.

**3.** Holt contends the government conceded at trial that Holt had standing to raise a Fourth Amendment objection to Officer Delacey's and Detective Wade's inspection of his clothing, and that this concession therefore recognized Holt's reasonable expectation of privacy in his clothing for all Fourth Amendment purposes. Holt is

wrong. He erroneously equates the "reasonable expectation of privacy" test, used to determine whether the movant personally has a stake sufficient to bring the suppression motion, with the similarly-described test used to decide the merits of the motion: whether an unlawful warrantless search in fact has occurred. Despite the similar language, the two tests are not the same. It is possible for a person to retain a property interest in an item, and thus have a solid basis for contesting its search and seizure, while at the same time relinquishing any reasonable expectation of privacy for purposes of obtaining suppression. *See Rawlings v. Kentucky,* 448 U.S. 98, 112, 100 S.Ct. 2556, 2565, 65 L.Ed.2d 633 (1980)(Blackman, J., concurring) (distinguishing reasonable expectation of privacy to establish standing from reasonable expectation of privacy to establish search); *In re B.K.C.,* 413 A.2d 894, 899–900 (D.C.1980) (same); *United States v. Thomas,* 275 U.S.App.D.C. 21, 23, 864 F.2d 843, 845 (1989) (same). According to Professor LaFave:

[I]t is important to keep in mind that the question traditionally labelled as standing (did the police intrude upon *this defendant's* justified expectation of privacy?) is not identical to, for example, the question of whether any Fourth Amendment search has occurred (did the police intrude upon *anyone's* justified expectation of privacy?).

5 LaFAVE *supra* note 2, § 11.3 at 121. It is clear from the record that the government conceded Holt had a legitimate expectation of privacy for the limited purpose of permitting him to object to

such expectation here.[4] On the evening police arrested Holt, he voluntarily walked into Washington Hospital Center's emergency room wearing—for everyone to see—the clothing the police later inspected. Hospital staff, patients, and anyone else in the emergency room were able to view what Holt was wearing before the clothing was removed to attend to his medical emergency. It is now well settled that "what a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection," because the exposure withdraws any expectation of privacy. *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967). In effect, there can be no Fourth Amendment search where "the police merely gaze[ ] upon what the world ha[s] already seen." *People v. Hayes,* 154 Misc.2d 429, 584 N.Y.S.2d 1001, 1003 (N.Y.Sup.Ct.1992). In the present case, the police observed what Holt himself openly had displayed minutes earlier.

This tenet of Fourth Amendment jurisprudence undergirds the now well established "plain view" and "open fields" exceptions to the warrant requirement. Although this case does not present a classic "plain view" scenario, because hospital personnel put Holt's clothes into a bag, the logic underlying that exception remains compelling here. Just as Holt had no reasonable expectation of privacy in his physical appearance, handwriting, or voice, he had no reasonable expectation of privacy in the appearance of his publicly worn clothing.[5] *See, e.g., Oliver v. United States,* 466 U.S. 170, 179–180, 104 S.Ct. 1735, 1741–42, 80 L.Ed.2d 214 (1984) (open fields); *United States v. Dionisio,* 410 U.S. 1, 14–15, 93 S.Ct. 764, 771–72, 35 L.Ed.2d 67 (1973) (physical characteristics and voice); *United States v. Mara,* 410 U.S.

19, 21, 93 S.Ct. 774, 775–76, 35 L.Ed.2d 99 (1973) (handwriting).

We are particularly persuaded that there is no legitimate expectation of privacy in this case because Holt failed to demonstrate either a subjective or a reasonably objective expectation of privacy in his clothing's appearance. The public exposure of Holt's clothing was not inadvertent; he elected to wear it into the hospital's emergency room, obviously anticipating relinquishment of control over it to hospital staff during his treatment. There is no indication that Holt ever asked to secure his clothes in a secured locker or in some other manner consistent with a desire to remove them from public view. Moreover, the emergency nature of his treatment objectively distinguishes the situation from the patient who comes to the hospital for elective surgery and reasonably expects—and is given—a private storage space, with lock and key, for all personal belongings including clothing. The emergency also objectively distinguishes the case from one in which an injured person goes home, deliberately puts all clothes in a dresser or private hamper, and calls the doctor. Nor is this a case involving a search inside the clothing for concealed items in the wearer's pockets or lining.

From all we can tell of record, the fact that hospital personnel placed Holt's clothing in a bag under the gurney where he was treated, rather than on a table or on a hanger in plain view, was altogether fortuitous. That fortuity—in contrast with Holt's manifest indifference to what happened to his clothes—should not drive the analysis to the point of making concealed and private in law what was unconcealed and public in fact. *Cf. United States v. Thomas,* 275 U.S.App.D.C. 21, 24,

---

the inspection of his clothing, but not for the broader purpose of conclusively acknowledging the unlawfulness of the Fourth Amendment search at issue.

**4.** Holt and the government agree that the police did no more than perform a visual inspection of Holt's clothing. Because the police did not conduct a more intrusive search extending beyond a visual inspection, such as a search of the pockets or interior lining of the clothing, we need only address whether Holt had a legitimate expectation of privacy in the appearance of his clothing.

**5.** We note that state courts which have considered this question have reached the result we do. *See, e.g., Wagner v. Hedrick,* 181 W.Va. 482, 383 S.E.2d 286, 291 (1989) (no expectation of privacy in personal effects in emergency room); *People v. Sutherland,* 92 Ill.App.3d 338, 47 Ill.Dec. 954, 958, 415 N.E.2d 1267, 1271 (1980) (no reasonable expectation of privacy in clothing removed at hospital); *State v. Smith,* 88 Wash.2d 127, 559 P.2d 970, 976 (1977) (no reasonable expectation in clothes over which hospital personnel had control).

864 F.2d 843, 846 (1989) (items left in public place); *see also* 1 LaFave, *supra* note 2, § 2.6(b) at 575 ("even inadvertent leaving of effects in a public place ... can amount to a loss of any justified expectation of privacy").

In sum, by choosing to walk into the emergency room wearing the clothing he had on when he was shot, and by apparently failing to insist that he, rather than hospital personnel, keep control over his clothing (*e.g.*, in a locker), Holt did not "firmly desire[ ] to keep secret" from anyone, including the police, the outward appearance of his clothing. *United States v. Ramapuram*, 632 F.2d 1149, 1155 (4th Cir.1980).

Because the inspection of Holt's clothing did not infringe upon an expectation of privacy "society is prepared to recognize as reasonable," *Olson*, 495 U.S. at 95–96, 110 S.Ct. at 1687, the trial court did not err in refusing to exclude the clothing as tainted fruit of an unlawful arrest. Having lawfully inspected Holt's clothing, Detective Wade properly used its consistency with the lookout description to call Detective Rich and ask him to bring Officer Morris to the hospital to take a look at Holt and, if possible, to make a showup identification. Once Morris identified Holt as the man who had assaulted him, the police had probable cause to arrest Holt at the hospital. *See Hill v. United States*, 627 A.2d 975, 978–79 (D.C.1993) (probable cause to arrest based on particularized description of suspect at specified location); *Spinner v. United States*, 618 A.2d 176, 178 (D.C.1992) (probable cause to arrest exists when police have reasonable belief that "an offense had been ... committed").[6]

**B.**

◼ Holt next contends that, even if the initial police inspection of his clothing was lawful, its seizure was not justified as lawfully incident to his arrest. *See Chimel v.*

California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Holt says the clothing was not sufficiently in his possession, and thus that the police lacked any of the traditional rationales, to authorize a search "incident" to his arrest. *See Chimel*, 395 U.S. at 763, 89 S.Ct. at 2040.

◼ Once the police make a lawful arrest, they may search "the arrestee's person and the area 'within his immediate control,' " *Chimel*, 395 U.S. at 763, 89 S.Ct. at 2040, in order to prevent the arrestee from gaining possession of a weapon or destructible evidence. Here, the trial court found that the hospital bag containing Holt's clothing was underneath Holt's hospital gurney when seized. When Detective Rich arrested Holt in the emergency room, Holt was neither handcuffed nor within the secure grip of a police officer, and his medical condition did not prevent him reaching the bag with a lunge if he had wanted to do so. The bag of clothing, therefore, was located in an area within Holt's "immediate control," *id.*, at the time of his arrest. *See, e.g., United States v. Maldonado–Espinosa*, 968 F.2d 101, 104 (1st Cir.1992) (carry-on bag on table next to defendant and within reach); *People v. Lyda*, 27 Ill.App.3d 906, 327 N.E.2d 494, 498 (1975) (jacket on peg across a large room); *State v. LeBlanc*, 347 A.2d 590, 595–96 (Me.1975) (jacket eight to ten feet away); *State v. Brasel*, 538 S.W.2d 325, 332 (Mo.1976) (en banc) (unlocked attache case four feet away); *Commonwealth v. Wheatley*, 266 Pa.Super. 1, 402 A.2d 1047, 1050 (1979) (jacket hanging on kitchen chair).

◼ The fact that the police might not actually have feared Holt would seize a weapon or attempt to destroy evidence located in the bag is not fatal to lawful seizure under *Chimel*. It is clear that "[t]he fact of a

6. Because the police inspection of Holt's clothing was lawful, we need not decide whether the evidence was admissible under one of the recognized exceptions to the tainted fruits doctrine. *See, e.g, Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (attenuation); *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (independent source); *Nix v. Williams*, 467 U.S. 431, 104 S.Ct.

2501, 81 L.Ed.2d 377 (1984) (inevitable discovery). Accordingly, this court need only decide whether the clothing was seized incident to Holt's lawful arrest. *See Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

lawful arrest, standing alone, authorizes a search," *Michigan v. DeFillippo,* 443 U.S. 31, 35, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979), regardless of whether one of the underlying rationales for the *Chimel* rule was applicable in fact. The authority to search a person incident to arrest does not depend upon the "probability [that] weapons or evidence would in fact be found." *Robinson,* 414 U.S. at 235, 94 S.Ct. at 477; *see also United States v. Chadwick,* 433 U.S. 1, 15, 97 S.Ct. 2476, 2485–86, 53 L.Ed.2d 538 (1977); *United States v. Edwards,* 415 U.S. 800, 802, 94 S.Ct. 1234, 1236–37, 39 L.Ed.2d 771 (1974); *Gustafson v. Florida,* 414 U.S. 260, 265–66, 94 S.Ct. 488, 491–92, 38 L.Ed.2d 456 (1973).

\* \* \* \* \* \*

Accordingly, the trial court did not err in admitting Holt's clothing in evidence. It was neither tainted as fruit of the initial inspection nor seized unlawfully in connection with Holt's arrest.

### III.

Holt maintains the trial court erred in failing to suppress Officer Morris's showup identification of Holt on the ground it was unduly suggestive and unreliable. The trial court rejected Holt's contention at a pretrial suppression hearing. This court is "bound by the trial court's findings if they are supported by the evidence and in accordance with law." *Stewart v. United States,* 490 A.2d 619, 623 (D.C.1985); *see also Henderson v. United States,* 527 A.2d 1262, 1268 (D.C.1987).

In assessing whether an identification is admissible, the trial court confronts potentially a two-step inquiry: (1) whether the identification procedure was " 'unnecessarily suggestive and conducive to irreparable misidentification,' " and, if so, (2) whether under the " 'totality of the circumstances' " the identification was still reliable. *Henderson,* 527 A.2d at 1267 (quoting *Stewart,* 490 A.2d at 622); *accord Patterson v. United States,* 384 A.2d 663, 665 (D.C.1978). Here, the trial court found both: the showup identification "was not unnecessarily suggestive" and was

"sufficiently reliable to be presented to a trier of fact."

Before the showup identification, police did not inform Officer Morris that the physical appearance and clothing of the suspect he was about to see matched his earlier broadcasted lookout. When Morris arrived at the Washington Hospital Center, detectives directed him to the room where Holt was being treated. Unaccompanied by other officers, Morris viewed Holt, who was lying on a hospital gurney without restraint. Under these circumstances, the trial court did not err: the showup was not "unnecessarily suggestive and conducive to irreparable identification." *Stewart,* 490 A.2d at 622. *See, e.g., Singletary v. United States,* 383 A.2d 1064, 1068–69 (D.C.1978) (upholding identification of suspect in back of police car after police told victim they had found suspect fitting victim's description); *Garris v. United States,* 559 A.2d 323, 327 (D.C.1989) (upholding identification of suspect presented to victim in handcuffs).

Even if we were to accept Holt's argument that the showup was unnecessarily suggestive, the trial court's finding that the identification was nonetheless reliable is also supported by the evidence. Trial courts must consider several factors in assessing reliability: (1) the opportunity of the witness to view the suspect during the crime, (2) the witness's degree of attention, (3) the accuracy of the prior description of the suspect, (4) the level of certainty at the confrontation, and (5) the amount of time between crime and confrontation. *See Henderson,* 527 A.2d at 1268–69; *Stewart,* 490 A.2d at 623; *Taylor v. United States,* 451 A.2d 859, 863 (D.C. 1982) (citing *Neil v. Biggers,* 409 U.S. 188, 200–01, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972)), *cert. denied,* 461 U.S. 936, 103 S.Ct. 2105, 77 L.Ed.2d 311 (1983).

We begin by noting that showup identifications, by their very nature, have "uniquely powerful indicia of reliability." *Singletary,* 383 A.2d at 1068. Morris, moreover, viewed the suspect, later identified as Holt, while Morris was chasing a group of persons outside Edgewood Terrace for approximately a minute before Holt assaulted

Morris. When Holt pointed his gun at Morris, Holt was only a few car lengths away and the lighting conditions on the street were fair. Based on his observations, Morris broadcast a detailed lookout, including a description of the suspect's clothing and physical appearance. The amount of time between the crime and confrontation at the hospital was short, a little over half an hour. Finally, Morris testified that he was "sure" after his first viewing that Holt was the gunman. According to Morris, he returned to view Holt a second time and made a "hundred percent certain" identification.[7] On this record, we cannot say the trial court erred in finding that the identification of Holt was reliable.

## IV.

We may deal summarily with Holt's contentions that the trial court erred in (1) permitting the prosecutor to impeach Holt with a prior conviction for possession of marijuana; (2) refusing to give a requested jury instruction concerning the charge of assault on a police officer with a dangerous weapon; and (3) refusing to dismiss one of the PFCV counts.

 Holt contends the trial court erred in allowing the prosecutor to impeach him because possession of marijuana is not a crime involving "dishonesty or false statement." D.C.Code § 14–305(b)(1) (1995 Repl.) permits impeachment of a witness by a prior conviction involving "dishonesty or false statement (regardless of punishment)."[8]

In *Durant v. United States,* 292 A.2d 157, 160 (D.C.1972), *cert. denied,* 409 U.S. 1127, 93 S.Ct. 946, 35 L.Ed.2d 259 (1973), this court concluded after examining the legislative history of § 14–305(b) that possessory crimes involve "dishonesty or false statement" within the meaning of the statute. We have subsequently reaffirmed that result. *See (Maurice) Thompson v. United States,* 571 A.2d 192, 195 (D.C.1990); *(Tony) Thompson v. United States,* 546 A.2d 414, 425 (D.C.1988).[9] Accordingly, the trial court did not err in permitting the prosecutor to impeach Holt with his prior conviction for possession of marijuana.

## B.

 Given his theory of the case—that he had abandoned the assault after discovering Morris was a police officer—Holt says the trial court erred in refusing to instruct the jury that the assault upon Morris "could have been abandoned prior to its completion upon [Holt's] knowledge that it [was] being committed against a police officer." After rejecting Holt's requested instruction, the trial judge gave the jury the standard instruction for assault on a police officer. *See* Criminal Jury Instructions for the District of Columbia, No. 4.11 (4th ed. 1993).[10] The instruction required the jury to find that Holt "knew or had reason to believe" that Morris was a police officer, and that Holt had "acted voluntarily and on purpose," before finding Holt guilty of assault on a police officer.

7. Holt objects in particular to Morris's second viewing of Holt because it "forced Morris to become certain" of his identification. Morris, however, testified that he was "sure" of his identification after the first viewing of Holt and that he viewed Holt a second time in order to be "fair."

8. D.C.Code § 14–305(b)(1) (1995 Repl.) provides:

Except as provided in paragraph (2), for the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a criminal offense shall be admitted if offered, either upon the cross-examination of the witness or by evidence aliunde, but only if the criminal offense (A) was punishable by death or imprisonment in excess of one year under the law under which he [or she] was convicted, or (B) involved dishonesty or false statement (regardless of punishment). A party establishing conviction by means of cross-ex-

amination shall not be bound by the witness' answers as to matters relating to the conviction.

9. Holt asks us to overrule *Durant.* We decline to do so. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971) ("no division of this court will overrule a prior decision of this court").

10. Criminal Jury Instruction No. 4.11 in relevant part provides:

4. That at the time the defendant did so, s/he knew or had reason to believe that the complainant was a member of the police force operating in the District of Columbia; and
5. That the defendant acted voluntarily and on purpose, not by mistake or accident.
Criminal Jury Instructions for the District of Columbia, No. 4.11 (4th ed. 1993) (instruction 4.15 in 1978 edition).

Although a trial court commits reversible error in refusing to instruct a jury adequately on a defendant's sustainable theory of defense, a trial court "need not give the instruction in the precise language that is requested." *Campos v. United States,* 617 A.2d 185, 187 (D.C.1992). The instruction the trial court gave here adequately conveyed Holt's abandonment theory. The trial court also permitted Holt to argue this theory to the jury. Under these circumstances, we cannot say the trial court erred in refusing Holt's proffered defense instruction. *See Stack v. United States,* 519 A.2d 147, 154–55 (D.C.1986); *Fludd v. United States,* 336 A.2d 539, 541 n. 3 (D.C.1975).

### C.

Finally, Holt contends the trial court erred in refusing to dismiss one of the PFCV counts in the indictment. Holt argues that, because the predicate offense of assault on a police officer is not one of the "crimes of violence" enumerated in D.C.Code § 22–3201(f) [11] upon which PFCV liability must be based, *see* D.C.Code § 22–3204(b), the PFCV count must be dismissed. This court, however, has already considered and rejected the argument Holt raises here. In *Parks v. United States,* 627 A.2d 1 (D.C.1993), we examined the language of § 22–3204 and concluded that it would "defy reason and common sense," *id.* at 9–10, not to include assault on a police officer among the "crimes of violence" listed at § 22–3201(f). *See supra* note 11. Accordingly, the trial court did not err in refusing to dismiss the PFCV count.

*Affirmed.*

---

**11.** D.C.Code § 22–3204(b) (1995 Supp.) provides:

> (b) No person shall within the District of Columbia possess a pistol, machine gun, shotgun, rifle, or any other firearm or imitation firearm while committing a crime of violence or dangerous crime as defined in § 22–3201.

The relevant portion of D.C.Code § 22–3201 (1995 Supp.) provides:

> (f) "Crime of violence," as used in this chapter, means any of the following crimes, or an attempt to commit any of the same, namely:

Murder, manslaughter, first degree sexual abuse, second degree sexual abuse, or child sexual abuse, mayhem, maliciously disfiguring another, abduction, kidnapping, burglary, robbery, housebreaking, any assault with intent to kill, commit first degree sexual abuse, second degree sexual abuse, or child sexual abuse, or robbery, assault with a dangerous weapon, assault with intent to commit any offense punishable by imprisonment in the penitentiary, arson, or extortion or blackmail accompanied by threats of violence or aggravated assault.