**James McFERGUSON and Dion Worthington, Appellants,**

v.

**UNITED STATES, Appellee.**

**James McFERGUSON, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 98–CF–1124, 98–CF–1129, 98–CF–1273.

District of Columbia Court of Appeals.

Argued Jan. 18, 2001.
Decided March 15, 2001.

Rufus W. McKinney, Jr., for appellant McFerguson in both appeals.

Colleen B. McCrystal, Public Defender Service, with whom James Klein and Jaclyn Frankfurt, Public Defender Service, were on the brief, for appellant Worthington.

Suzanne Grealy Curt, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Mary Patrice Brown, and Lydia Pelegrin, Assistant United States Attorneys, were on the brief, for appellee in both appeals.

Before SCHWELB, FARRELL, and REID, Associate Judges.

Farrell, Associate Judge:

These consolidated appeals arise from separate trials having in common only the fact that the defendant McFerguson was convicted in both for burglaries committed in roughly the same part of Northwest Washington, D.C. In No. 98–CF–1129, McFerguson was found guilty by a jury of burglary in the second degree. In Nos. 98–CF–1124 and 98–CF–1273, McFerguson and Worthington were each convicted by a jury of burglary in the second degree and theft in the second degree. The only issue warranting this published opinion is Worthington's contention that the trial court erroneously denied his motion to suppress physical evidence and an identification stemming from what he claims was an illegal seizure of his person and search of a plastic bag he was carrying when the police stopped him and McFerguson. We

conclude that resolution of this issue requires a remand to the trial court for additional findings relevant to the government's argument of inevitable discovery. We affirm all of McFerguson's convictions.

## I. Facts Relevant to the Suppression Issue

Officer Tonya Toler of the Metropolitan Police Department (MPD) and her partner were in a police car patrolling the area of upper Massachusetts Avenue, N.W., near the Naval Observatory. Just before 10:00 a.m., she heard a radio report of a burglary that had occurred in the 3400 block of Garfield Street, N.W., not far from Massachusetts Avenue. The radio run described the suspected burglars as two black males, one wearing a white shirt and red pants, and one of them "tall." As her car drove up Massachusetts Avenue approaching 34th Street, Toler saw two black men walking together on the other side of Massachusetts Avenue in the opposite direction, leading downhill toward Rock Creek Parkway and Dupont Circle. The taller of the two men, whom Toler later identified as Worthington, was wearing red pants and a white shirt (she could not recall what the other man was wearing). Both men were walking "pretty fast" and appeared to have "bulge[s]" in the front of their jackets. By the time the officers could turn their car around and begin driving down Massachusetts Avenue looking for the suspects, the two men had disappeared.

At that point Toler heard a radio run stating that two men had been stopped by U.S. Secret Service officers on Rock Creek Parkway near the exit to P Street. She went directly to the place of the stop, taking about five minutes to do so, and saw that Secret Service officers had detained the two men she had seen minutes before. "[T]hey were the same two [men]," she testified, except that "the clothes were different": Worthington was wearing a white shirt but gray instead of red pants.

Officer Kevin Porter of the U.S. Secret Service, while driving north on Rock Creek Parkway with his partner, had monitored the same lookout report Toler heard. Along with his partner, he saw two black males later identified as Worthington and McFerguson running southbound on the Parkway from Waterside Drive, which connects Massachusetts Avenue with the Parkway. What "caught [his] attention" was that

> they were running on the right-hand side of the northbound lane [where] there is no sidewalk. . . . [I]t's where the hill comes down and meets the road. And just as I was getting up to them, they cut right in front of my vehicle to the other side of the road, causing us to stop. . . .

The two men were in

> a full-blown run. They were running directly at me, . . . trying to stay up on the hill and avoid being hit by traffic, and dodging in and out of traffic, and then [they] cut right in front of my vehicle.

One of the men—Worthington—was tall and had what appeared to be a red bag in his hand; both "were sweating profusely . . . and out of breath" from having "run[ ] hard . . . from a distance," and appeared "frantic." Although Worthington was wearing a white shirt and gray pants rather than red pants, Porter believed the pair to be the suspects wanted for the burglary. He did so because of "their proximity to the [burglary] location," their general match to "the one basic description" of two black males, one tall and wearing a white shirt; and the fact that "[n]obody runs through the Parkway like that"—"[t]hey had an appearance . . . of fleeing something."

Porter therefore turned his car around and caught up with the suspects at the entrance ramp to the Parkway at P Street, a distance he estimated at half a mile from the burglary site.[1] Porter and his partner stopped the pair (the other man was McFerguson), took the red bag from Worthington and put it on the ground, and frisked both men. Porter then notified the Secret Service Control Center of the stop and told "them to notify [MPD] Second District officers to respond down" to the scene. After doing this, he reached into the red bag ("a plastic type of designer shopping bag") and, opening it wider "so I could see what was in there," saw what appeared to be a couple of cameras and a CD player in it.[2] Soon afterwards MPD officers arrived and Porter briefed them. The MPD officers "were communicating back and forth" on their radios until "[s]omewhere down the line they indicated that the [burglary] complainant was going to be responding down for identification purposes." Porter's broadcast of the stop was made at 10:05 a.m., six minutes after the burglary lookout report by MPD and twenty minutes after the victim had reported seeing the burglars flee.

A third officer had also seen Worthington and McFerguson running. MPD Officer Hicks was driving northbound on Waterside Drive when he saw them turn from Massachusetts Avenue down onto Waterside Drive and "run[ ] past him at full speed."[3]

Finally, MPD Sergeant Charity testified that as "a supervisor on the scene" of the detention he had assembled there along with other police, including Officer Toler.

The burglary complainant was brought to the scene by a detective and, although she could not identify the detained men as the burglars she had seen leaving her house, she identified a camera and other items as property of herself or her husband. (At trial she added that she had recognized the red plastic bag as one she used to store a dress.)

## II. Legal Discussion

Worthington contends that Officer Porter lacked a reasonable articulable suspicion to stop him and that the search of the plastic bag and ensuing identification of its contents as stolen were the product of the illegal seizure. Even if the stop was lawful, he continues, Porter lacked probable cause to arrest him and search the bag incident to the arrest (the government agrees that the search required probable cause), and thus the contents of the bag and the complainant's identification of them should have been suppressed at trial.[4] The government counters that the collective knowledge of the police—Toler, Porter, and Hicks—at the time of the search furnished probable cause for Worthington's arrest and a search incident thereto, but that even if the search was unlawful, the stop of Worthington was valid and the discovery of the bag's contents was inevitable once the complainant was summoned to the scene and, independently, once Toler identified Worthington as the suspect who had worn the matching red pants.

### A.

■ The government begins its argument, however, by urging us to consider

---

1. At trial he stated that the distance was just over a mile and a half, based on his intervening measurement.

2. Porter explained that since the men were "running with a bag, I was curious as to the contents of the bag."

3. Hicks's sighting was recounted by Porter at the suppression hearing.

4. As pointed out, the complainant could not identify appellants personally as the burglars.

whether Worthington could even dispute the seizure and search of the bag, contending that since "the bag was not only freely exposed to the public, but also was stolen and filled with stolen property, ... Worthington had no reasonable expectation of privacy in it" (Br. for Appellee at 21). The government made this argument in the trial court, and has pressed it in its brief and at oral argument. We are unpersuaded by it.

The government first cites the principle "that 'what a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection,' because the exposure withdraws any expectation of privacy." *Holt v. United States*, 675 A.2d 474, 480 (D.C.1996) (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). Worthington, however, was carrying items on his person that were *un* exposed in a shopping bag.[5] (Officer Porter admitted he had had to reach into the bag to determine what items were inside.) The government also cites *Godfrey v. United States*, 408 A.2d 1244 (D.C. 1979), for the principle that a thief has no legitimate expectation of privacy in stolen property, but the language it relies on was subsequently deleted from the opinion.[6] Since Worthington was holding the shopping bag on his person at the time of the search, the relevant principle from *Godfrey* is that "a street pedestrian has a reasonable expectation of privacy in covered objects associated with his person." *Id.* at 1246 (citing cases). The contents of the bag were "sufficiently physically connected with [Worthington's] person to fall properly under the umbrella of protection of personal privacy." *Id.* at 1246–47.

In disputing this conclusion, the government relies heavily on the Supreme Court's insistence in recent years that to claim Fourth Amendment protection a person must show both that he displayed "an actual (subjective) expectation of privacy" in the object searched, and—particularly—that this expectation "is one that society is prepared to recognize as reasonable ... [or] justifiable under the circumstances." *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (citations and internal quotation marks omitted). The government questions whether society would impute a reasonable expectation of privacy to "a burglar ... running away from the crime scene carrying in plain view a distinctively marked shopping bag which has been stolen from the burgled residence and filled with the victim's property" (Br. for Appellee at 22).

It is not clear from this statement whether the government is stressing the exposed nature of the bag itself ("distinctively marked") or Worthington's status as "a burglar" and the "stolen" contents of the bag. To the extent the emphasis is on the latter, that description of Worthington and the contents assumes the very facts that were to be proved at trial-that he was fleeing with goods he had stolen in the burglary. If assuming those facts as given dictates whether he could move to suppress the evidence by which the government meant to prove his guilt, that would do away with the justification for suppression hearings in a great many cases, a proposition that alone leaves us skeptical. Moreover, emphasizing the "stolen" nature of the bag and its contents recalls notions of property or ownership long recognized

---

5. He differed markedly in that respect from the *Holt* defendant, who challenged the seizure of clothes from his hospital room after he had walked into the hospital wearing the clothes. *See* 675 A.2d at 480–81.

6. *See Godfrey v. United States*, 414 A.2d 214 (D.C.1980).

as secondary by the Supreme Court in Fourth Amendment analysis. *See Katz,* 389 U.S. at 352–53, 88 S.Ct. 507; *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 305–06, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) ("[W]e have given recognition to the interest in privacy despite the complete absence of a property claim by suppressing the very items which at common law could be seized with impunity: stolen goods.").[7] Anything resembling a broad exclusion of stolen goods (or contraband) from possessions enjoying Fourth Amendment protection would, we think, be irreconcilable with the justification the Supreme Court has required for a search in decisions such as *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), and *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), to name just two.

We therefore turn to whether the seizure and ensuing search of Worthington's bag was justified.

**B.**

█ As explained, Worthington challenges separately his initial seizure and the search of the plastic bag. In defending both, the government argues for application of the collective knowledge doctrine which, if applied, would allow us to aggregate the knowledge of Officers Toler, Porter, and Hicks at the point Worthington was stopped and the bag searched. *See generally Illinois v. Andreas,* 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). Worthington counters that this court has not aggregated police knowl-

edge unless the officers concerned were acting together or "cooperat[ing]" in an investigation, as shown by the fact that they had communicated with one another directly or through a dispatcher.[8] *See In re M.E.B.,* 638 A.2d 1123, 1129 (D.C.1993) (where detective had initially broadcast information about suspect, the collective knowledge doctrine applied even though he did not broadcast later-acquired information providing a reasonable basis for the stop). We think the government has the better of this argument.

Officer Toler heard and reacted to the same broadcast that caused Officer Porter to stop Worthington and McFerguson minutes later; and when she spotted the burglary suspects she was approximately a mile from where the stop took place. As in *M.E.B., supra,* "this investigation [concerned] a fast-moving sequence of events involving a number of law enforcement officers at several different locations in one section"—indeed, a small subsection—"of the city." *Id.* at 1133. Toler cannot be said to have "played no part in . . . the investigation or the search for those responsible," *id.;* she was just as much a part of that search as the officers who made the stop and whom she promptly joined at the stop location.[9] Had Toler (or, for that matter, Hicks, who saw Worthington and McFerguson turn off Massachusetts Avenue) paused in pursuing the suspects to radio their information to the dispatcher, Worthington does not appear to dispute that the information would then be includable in the facts justifying the stop. But *M.E.B.* does not require such

---

7. *See also Rakas v. Illinois,* 439 U.S. 128, 143 & n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

8. Worthington thus points to Officer Toler's admission that she did not report her sighting of the suspects by radio before losing sight of them on Massachusetts Avenue and responding down to Rock Creek Parkway.

9. The trial judge agreed, reasoning that because Toler "obtain[ed] information . . . through her eyes . . . in response to the [burglary] lookout, . . . she is someone who played a part in the investigation or search for those responsible."

communication as a matter of principle, and on the facts of this case we can see no logic in a requirement that might only have slowed Toler's already-delayed pursuit of the suspects.

 We therefore analyze the stop and search of Worthington considering everything known by the officers involved. Doing so, we have no difficulty concluding that Porter had a reasonable basis on which to stop Worthington, separate him from the bag, and detain him until the complainant could be brought to the scene.[10] Moments after he heard the burglary lookout, Porter saw the same two black males that Hicks had seen turn off Massachusetts Avenue and run down Waterside Drive toward the Parkway. One of the pair, Worthington, was tall and wearing a white shirt—consistently with the broadcast—and both were running "frantic[ally]" as though fleeing, dodging in and out of traffic and nearly colliding with Porter's car. Porter knew the place of the sighting to be less than a mile and a half from the burglary on Garfield Street near Massachusetts Avenue.

 Worthington points to the paucity of identifying details in the burglary report and the fact that neither he nor McFerguson was wearing red pants—the sole distinctive feature of the description—when Porter saw them. Their general appearance and frantic behavior, he asserts, was not enough to link them to a burglary that had occurred nearly twenty minutes earlier a mile or more from where they were running; i.e., it failed to narrow "the universe of possibilities of where the [actual]

burglary suspects could have fled" (Br. for Appellant at 17). We might be inclined to agree with this assertion, although we need not decide the point, if the only evidence of where within an "approximately ... two-mile radius of 3400 Garfield Street" (id.) the burglars had run was Porter's testimony. But Toler had seen two suspects matching the lookout completely—including the distinctive red pants—walking hurriedly down Massachusetts Avenue in the direction of Rock Creek Parkway barely five minutes before the stop. Given this additional fact, the police had reasonable grounds to suspect that the two black males Hicks saw leave Massachusetts Avenue and run down toward the Parkway (though neither wore red pants), and whom Porter saw moments later running in a way "nobody runs through the Parkway," were the burglars. See Turner, supra note 10, 699 A.2d at 1129 ("Because we examine the totality of the circumstances and require far less than certainty, we have routinely held that an imperfect description, coupled with close spatial and temporal proximity between the reported crime and seizure, justifies a Terry stop."); District of Columbia v. M. M., 407 A.2d 698, 700–01 (D.C.1979).

## C.

 The government concedes, nevertheless, that while reasonable suspicion justified the stop of Worthington and temporary removal of the bag from his possession, see United States v. Place, 462 U.S. 696, 706, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), it could not justify Porter's search of the bag's interior.[11] For that, probable

---

10. Although this court defers to relevant factual findings by the trial court, we review de novo the ultimate question of whether a seizure was supported by reasonable suspicion. See United States v. Turner, 699 A.2d 1125, 1127 (D.C.1997). While the Fourth Amendment imposes only "some minimal level of

justification to validate [a seizure]," I.N.S. v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), a reasonable suspicion must be one "particularized as to the individual stopped." Turner, 699 A.2d at 1128.

11. Porter and his partner also frisked the two suspects for their safety, but since nothing

cause was necessary to arrest Worthington and search the bag incident to the arrest. *See Rawlings v. Kentucky,* 448 U.S. 98, 110–11, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). The government argues, and the trial court concluded, that the combined information in the possession of Toler, Hicks, and Porter was sufficient to warrant a reasonably prudent person in believing Worthington and McFerguson had committed the burglary. *See Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1979).[12] We are not persuaded. The lone case cited by the government (and relied on by the trial court) is *Davis v. United States,* 230 A.2d 485 (D.C. 1967), which concerned two men arrested within two to three minutes of a housebreaking and one block from the scene of the crime; both wore clothing close in color to the descriptions of two of the housebreakers. *Id.* at 486. Here the separation of time and place was greater, and neither suspect matched the only distinctive feature of the lookout description, the

red pants. A survey of our decisions demonstrates that they have required a closer fit than this between the crime and the person apprehended-particularly between the description of the suspect and the appearance of the arrestee-before probable cause may be found.[13] We hold that the police, even taking into account their collective knowledge, lacked probable cause to arrest Worthington and search the bag incident to the arrest.

### D.

The government further argues that, even if the search of the bag was unlawful, Worthington was properly detained and once Officer Porter notified the MPD of the stop (through his call to the Secret Service Control Center), it was inevitable that the complaining witness would be brought to the scene and identify her bag and its contents. "Inevitable discovery" applies doubly in this case, the government asserts, because once Officer Toler heard the radio report of the stop, she came

was discovered as a result of the frisk, it presents no issue on this appeal.

12. As with the issue of reasonable suspicion, this court decides *de novo* whether there was probable cause to justify a search. *See Brown v. United States,* 590 A.2d 1008, 1020 (D.C. 1991).

13. *Compare In re T.L.L.,* 729 A.2d 334 (D.C. 1999) (description of black male, 14–18 years old, medium complexion, wearing dark clothes insufficient to support finding of probable cause); *Junior v. United States,* 634 A.2d 411, 420 (D.C.1993) (description of older black male, gray and black facial hair, and detailed clothing description, insufficient to support probable cause); *Bryant v. United States,* 599 A.2d 1107, 1112 (D.C.1991) (description of black male wearing brown suede-like jacket and gray khaki pants too general to support *Terry* stop); *Cauthen v. United States,* 592 A.2d 1021, 1023–24 (D.C.1991) (no reasonable suspicion; scanty description and 15 minute delay in arrival of police); *Brown v. United States,* 590 A.2d 1008, 1017 (D.C.1991) ("[d]escriptions applicable to large numbers

of people will not support a finding of probable cause"); *United States v. Lewis,* 486 A.2d 729, 733–34 (D.C.1985) (no probable cause; variations in height, weight and facial hair), *with Hill v. United States,* 627 A.2d 975, 979 (D.C.1993) (probable cause, where suspect matched a detailed description of his clothing, including "a black cap, orange or rust colored shirt, dark colored pants"); *Best v. United States,* 582 A.2d 966, 969 (D.C.1990) (probable cause, where suspect matched description stating he wore "a baseball-style cap with a star on it, black jacket, gray jeans and tennis shoes"); *Glass v. United States,* 395 A.2d 796, 805 (D.C.1978) (probable cause, where arrestees largely matched report of crime "by one white male, one white female, and one black male," with "rather particularized descriptions of each"); *Atkinson v. United States,* 295 A.2d 899, 902 (D.C.1972) (probable cause where suspect "reasonably matched" the lookout description in that he possessed a scar which was a "unique element of identification").

immediately to the scene and recognized Worthington as the suspect she had seen moments before wearing red pants. Quite apart from the identification by the complainant, therefore, Toler's identification would have ultimately led to Worthington's arrest and search. We examine both aspects of this argument.

The inevitable discovery doctrine provides that, even though the police have obtained evidence as a result of illegal conduct, the evidence still may be admitted "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." If "the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." Importantly, however, the doctrine "involves no speculative elements but focuses [instead] on demonstrated historical facts capable of ready verification or impeachment." That is, "the lawful process which would have ended in the inevitable discovery [must] have ... commenced before the constitutionally invalid seizure," *and* there must be "the requisite actuality" that the discovery would have ultimately been made by lawful means.

*Hicks v. United States,* 730 A.2d 657, 659 (D.C.1999) (citing, *inter alia, Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); emphasis in original). The government first points to Officer Porter's testimony that *before* he searched the shopping bag, he radioed the Secret Service Control Center and told it to notify the MPD that he had stopped the suspect-

ed burglars. This, the government asserts, set in motion "the lawful process" of bringing the burglary victim to the scene for an identification, in turn creating the "actuality" that she would recognize the bag and its contents as hers—as she in fact did [14]—and bring about Worthington's arrest.

Worthington responds that the record is barren "as to how the [MPD's] decision to bring the complainant to the scene came to pass," and that without such evidence "there is no way to know whether information about the stolen property that had been illegally recovered from the bag in any way prompted the decision to conduct a show-up" (Reply Br. for Appellant at 9–10). He points out that the trial judge gave the prosecutor repeated opportunity to call and recall witnesses to elucidate this matter but that in the end the testimony revealed only the following sequence: (a) Porter radioed the fact of the stop; (b) MPD officers responded to the scene and engaged in repeated radio communications "back and forth"; and (c) (according to Porter) only then, "somewhere down the line," did they "indicate[ ] that the complainant was *going to be responding down* for identification purposes."

■ We agree that on this record the prosecutor did not eliminate "speculati[on]," *Hicks, supra,* as to whether the search of the bag and retrieval of its stolen contents entered into the decision to summon the complainant to the scene. In *Hicks,* on comparable facts, we were able to say that "[h]ad the police not [unlawfully] searched the station wagon before notifying [another officer] of the stop of the

14. Although the suppression hearing drew no testimony that the complainant had identified the bag (as distinct from its contents), she testified at trial that she had done so, and the government cites the principle that in reviewing the motions judge's ruling we may rely as well on undisputed trial testimony. *See Clark v. United States,* 755 A.2d 1026, 1028 n. 1 (D.C.2000).

car[, which resulted in the robbery victim being brought to the scene], there is not the slightest reason to believe that events [leading to the identification] would have unfolded any differently." *Hicks*, 730 A.2d at 662. On the record here, we have nothing like that confidence that the search of the bag played no part in the decision to bring the burglary victim to the scene. Were this all the record revealed, therefore, we would be constrained to reject the government's assertion of an inevitable link between the stop itself and the recovery of the stolen goods.

■ But there is more. Officer Toler testified that when she heard by radio that two suspects had been stopped by Secret Service officers, she drove to the scene of the stop and at once recognized Worthington as the suspect she had seen wearing the red pants minutes before. Toler's testimony, which the trial judge credited on this point,[15] raises the strong possibility that Worthington would have been arrested and searched on the basis of her recognition alone, regardless of a later identification by the complainant. On the present record, however, we are unable to decide whether Toler's actions establish the required link between the lawful stop and inevitable discovery of the stolen property. Because the judge ruled that the search of

the bag was supported by probable cause, he did not reach the question of inevitable discovery and so had no occasion to make findings of fact concerning Toler's identification that bear on that issue.[16] Accordingly, in the interests of justice, *see* D.C.Code § 17–306 (1997), we will remand the record for consideration by the judge of the inevitable discovery doctrine solely as it relates to Officer Toler. The judge should make findings that include (but need not be limited to) whether Officer Porter made the original radio report of the stop before he searched the bag, and whether Toler heard and responded to that report (re-transmitted through the MPD)[17] rather than some later broadcast that may have incorporated the results of the unlawful search. On the basis of these findings, he should then determine whether—in his view—the government has met its burden of showing inevitable discovery, and transmit the supplemental record to us.[18] We leave to the judge the decision whether to reopen the evidentiary hearing for this purpose, *see Martin v. United States*, 567 A.2d 896, 907 (D.C.1989), a decision that may properly include consideration of the opportunity the government has already had to elicit testimony relevant to inevitable discovery. *See Barnett v. United States*, 525 A.2d 197, 200 (D.C.

15. Toler, the judge pointed out, had "made an unwavering identification of [McFerguson] and Worthington here in court as the ones who were stopped by the Secret Service agents and who[m] she had seen [on Massachusetts Avenue]."

16. This court "may affirm on any basis argued to the trial court," but only "when no additional factfinding is necessary." *Young v. United States*, 670 A.2d 903, 906 (D.C.1996).

17. Toler acknowledged at trial that she did not monitor directly Porter's report, but rather an ensuing broadcast by MPD.

18. We need not decide at this point whether the ultimate ruling on inevitable discovery is to be made *de novo* or under a more deferential standard of review. *Compare United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (applicability of inevitable discovery exception is mixed question of law and fact to be reviewed *de novo* ), *with United States v. Lang*, 149 F.3d 1044, 1047 (9th Cir.1998) (inevitable discovery rulings are mixed questions of law and fact, which nonetheless should be reviewed under a clearly erroneous standard), *and Oken v. State*, 327 Md. 628, 612 A.2d 258, 271 (1992) (reviewing inevitable discovery ruling under clearly erroneous standard).

1987). We will retain jurisdiction over Worthington's appeal.

## III.

Appellant McFerguson assigns a number of errors related to both of his trials; none requires extended discussion or provides a basis for reversal.

■ First, McFerguson's actions with Worthington in hurriedly leaving the area of the Garfield Street burglary (where the complainant had seen two men run from her house), combined with the recovery of the stolen items from Worthington's possession, were sufficient to support the jury's conclusion that McFerguson was one of the two burglars. *See, e.g., Wheeler v. United States*, 470 A.2d 761, 764 (D.C.1983).[19] Second, although a criminal defendant is generally entitled to a jury instruction setting forth his theory of the case, *see Jackson v. United States*, 645 A.2d 1099, 1101 (D.C.1994), there was no evidence that McFerguson was in the area of the P Street "beach" at the time of the Garfield Street burglary, and thus the trial judge was not obliged to instruct the jury on that theory of alibi. *See Greenhow v. United States*, 490 A.2d 1130, 1135 (D.C. 1985).[20]

■ In No. 98–CF–1129, McFerguson appeals from his conviction for a burglary he was shown to have committed on Porter Street, N.W., when he entered an apartment building garage with another man and tried to break the locks securing some bicycles. McFerguson first contends that the trial judge erroneously allowed the government to introduce evidence of his home address, which he had given a police officer at the time of his arrest.[21] Assuming the address had no probative value, an issue we do not decide, McFerguson has not shown prejudice sufficient to overcome the strong eyewitness evidence of his activities inside the garage.[22]

McFerguson next argues that his statement to the arresting officer that the charges against him would be reduced and he would soon be released from custody was obtained in violation of *Miranda, supra* note 22. The trial judge, after a hearing, found that McFerguson had volunteered the statement, and we have no reason to dispute that finding. *See Spann v. United States*, 551 A.2d 1347, 1350–51 (D.C.1988). Further, as in the consolidated case, the trial judge did not err in refusing to instruct the jury that McFerguson's defense was that he had missed the bus and was walking towards Adams Morgan to catch one, when no testimony was presented to that effect. Finally, the evidence justified an instruction to the jury on aiding and abetting. *See, e.g., Bayer v. United States*, 651 A.2d 308, 310–11 (D.C.1994).

## IV.

In summary, as to McFerguson, we affirm the judgments of conviction. As to

---

19. McFerguson's complaints about the reliability of Toler's and Hicks's identifications go to the weight of their testimony, not its admissibility. *See United States v. Hunter*, 692 A.2d 1370, 1376 (D.C.1997).

20. The judge did instruct that McFerguson denied committing or having any knowledge of the crimes.

21. At oral argument, McFerguson suggested the only reason the prosecutor presented this evidence was to identify him as a stranger in the neighborhood from another part of the city who "had no business being there." The government's theory at trial was that the address did show why McFerguson was walking back down Porter Street after the burglary, *i.e.*, he was on his way home.

22. McFerguson's additional claim that the statement, made during routine booking, was taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), has not been adequately preserved.

Worthington, we remand the record to the trial court for further proceedings in accordance with this opinion.

*So ordered.*