William D. BERG, et al., Appellants,

v.

UNITED STATES, Appellee.

Nos. 87–CM–324, 87–CM–325, 87–CM–344, 87–CM–413 through 87–CM–417, 87–CM–419, 87–CM–427, 87–CM–451, 87–CM–552 through 87–CM–554, 87–CM–625, 87–CM–626, 87–CM–656 and 87–CM–658.

District of Columbia Court of Appeals.

Argued Feb. 17, 1993.
Decided Sept. 16, 1993.

Mark L. Goldstone, Eldensburg, MD, for appellants.

Kenneth C. Kohl, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the

time the brief was filed, and John R. Fisher, Elizabeth Trosman, and Julieanne Himelstein, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before TERRY, STEADMAN, and SULLIVAN, Associate Judges.

SULLIVAN, Associate Judge:

Each of the eighteen appellants[1] was charged in a three-count information with three misdemeanors: unlawfully demonstrating within the United States Capitol Building, in violation of D.C.Code § 9–112(b)(7) (1989) ("the demonstration statute");[2] obstructing or impeding passage through or within the United States Capitol Building, in violation of D.C.Code § 9–112(b)(5) (1989) ("the obstruction statute");[3] and unlawfully remaining and refusing to quit a public building after being asked to leave by a person lawfully in charge, in violation of D.C.Code § 22–3102 (1989) ("the unlawful entry statute").[4] The charges arose out of a demonstration inside the Rotunda of the United States Capitol Building ("the Rotunda")[5] against legislation then pending in Congress which would provide $100 million in military aid to the Contra rebels in Nicaragua.

 Following a month-long trial, a jury convicted all eighteen appellants of the three misdemeanor offenses. In these consolidated appeals,[6] appellants contend that

1. The appellants, ten of whom testified at trial, are: William D. Berg, Elizabeth Peterson, Jill Warzer, Louisa C. Whitlock, Roger O. Hassol, Elizabeth L. Wallace, Jeffrey C. Colledge, Brian C. Gluck, Alan Clark, James Robert Simpson, Joan Arnold, Nancy C. Tate, David Dellinger, Joseph S. DeRaymond, Lynn E. Currey, Jane A. Werley, Morgan C. Irons, and Michael R. Arnowitt–Reid. (Whitlock, Werley, Gluck, Dellinger, Arnold, and Clark appeared *pro se* in the trial court.)

2. D.C.Code § 9–112(b)(7) provides:

 It shall be unlawful for any person or group of persons willfully and knowingly ... [t]o parade, demonstrate, or picket within any of the Capitol Buildings.

3. D.C.Code § 9–112(b)(5) provides:

 It shall be unlawful for any person or group of persons willfully and knowingly ... [t]o obstruct, or to impede passage through or

within, the United States Capitol Grounds or any of the Capitol Buildings[.]

4. D.C.Code § 22–3102 provides:

 Any person who, without lawful authority, shall enter, or attempt to enter, any public or private dwelling, building or other property, or part of such dwelling, building or other property, against the will of the lawful occupant or of the person lawfully in charge thereof, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person lawfully in charge thereof, shall be deemed guilty of a misdemeanor....

5. Appellants were among the total 113 participants arrested.

6. We are presented with a threshold jurisdictional question. The jury returned a verdict of

their convictions violated their First Amendment rights to free speech and to assemble peaceably and petition their government for a redress of grievances, thereby rendering D.C.Code §§ 9–112(5), (7), and 22–3102 unconstitutional as applied to their conduct.[7] We affirm.[8]

## I.

The government's evidence showed that at approximately 12:30 p.m. on August 4, 1986, a day when Congress was in session, appellants and others gathered in the center of the Capitol Rotunda. They stood talking both inside and outside of the stanchions which had been set up to mark clear passageways for legislators, employees, and tourists. According to a stipulation by the parties, which was read in open court by the trial judge, the group totalling approximately 113 had come as part of the Pledge of Resistance "to protest Contra aid, which was then under debate in the Senate, and ... each [proceeded to] demonstrat[e] in the center of the Rotunda between approximately 12:45 p.m. and the time of their respective arrests ... by the Capitol Police...."

Following a moment of silence, the group engaged in a "die-in" dramatization of what they called "the slaughter of the innocents" in Nicaragua. They formed a circle and began to reenact a death scene. Some fell to the floor and unfurled a large banner,[9] while others pretended to shoot them by pointing their fingers and making shooting noises. This continued for a minute or two until approximately three-quarters of the group, some wearing clothing splattered with red paint to symbolize the blood of dying Nicaraguan people, were either sitting or lying on the floor displaying the banner. The ten appellants who testified admitted that they were part of the group on the floor. Those who remained standing took turns in reading from prepared texts and leading those on the floor in responsive group readings and chants.

Lieutenant Lawrence Hill of the United States Capitol Police testified on behalf of the government at trial. Lieutenant Hill stated that he was the Section Commander on duty at the Rotunda on August 4, 1986, which meant that he was in charge of enforcing all laws and regulations. He stated that appellants and their fellow demonstrators were much more numerous than ordinary tour groups, which are limited to not more than fifty in the Rotunda. Lieutenant Hill testified that the demonstrators took up "such a large portion of the Rotunda [that] they entirely engulfed the center portion that [the police] had roped off" to mark the intersection and to outline the connecting corridors. He testified further that appellants made it "impossible" for anyone using the designated passageways "to gain access" through the Rotunda from either the north to the south or the east to

---

guilty against all appellants on February 13, 1987. Some of the appellants were sentenced to unsupervised probation on that date and filed notices of appeal on March 13, 1987. All of the appellants filed motions for new trials on February 19, 1987, which, according to D.C.App.R. 4(b)(2), tolled the time for filing notices of appeal. *See Taylor v. United States,* 603 A.2d 451, 458 n. 19 (D.C.1992). On April 28, 1987, the trial court orally denied the motions and sentenced to terms of unsupervised probation the remaining appellants who had not previously filed notices of appeal; that group of appellants noted their appeals on May 27, 1987. In our view, the April 28 ruling on the motion was an "effective" ruling so as to cause the premature appeals to ripen and the subsequent appeals to be effective to give us jurisdiction to act. *See Carter v. Cathedral Ave. Coop., Inc.,* 532 A.2d 681, 683 (D.C.1987) (footnote omitted); *see also United States v. Cortes,* 895 F.2d 1245, 1247 (9th Cir.1990) (interpreting substantially identical Fed.R.App.P. 4(b)).

7. Appellants do not challenge the constitutional validity of D.C.Code §§ 9–112(b)(5), (7), and 22–3102 as written.

8. Appellants' counsel first informed this court at oral argument that their appeal also challenged the constitutionality of Capitol Police General Order No. 303.1, both facially and as applied, without having addressed the issue in their brief. We need not reach that issue. *See Cratty v. United States,* 82 U.S.App.D.C. 236, 243, 163 F.2d 844, 851 (1947) (points not urged in brief treated as abandoned).

9. At least one of the demonstrators displayed a cardboard sign.

the west.[10] According to his testimony, the demonstrators were also louder than ordinary tourists in that they were "shouting" and "speaking in unison" and "could be heard throughout the entire Rotunda."

As soon as the demonstrators started dropping to the floor, Lieutenant Hill, using an amplifier, advised the entire group "that they were in violation of the building regulations [namely, U.S. Capitol Police General Order No. 303.1][11] and asked them to please stand ... and please cease and desist." Appellants failed to stand. The Chief of Police then ordered the Rotunda closed, and the Capitol Police cleared the Rotunda of everyone except the demonstrators. Lieutenant Hill testified that he then "advised the individuals laying [sic] on the floor and demonstrating ... that the Rotunda was now closed and that they were hereby ordered to [stand up and] leave at this time and if they failed to do so, they would be placed under arrest for unlawful entry." No one in the group got up and left.

Lieutenant Hill testified that he waited for a short period of time and then repeated the identical warning twice more; nonetheless, no one in the group of demonstrators got up and left. Instead, they continued to demonstrate. Lieutenant Hill then ordered the arrest team to move in. He testified that members of the arrest team gave each individual demonstrator one final opportunity to leave the Rotunda before arresting him or her. Moreover, his testimony was that right up until the actual moment of arrest, each individual demonstrator "would have been free to leave."[12]

## II.

Appellants contend on appeal that their expressive conduct in the Capitol Rotunda on August 4, 1986, was entitled to First Amendment[13] protection and that, therefore, their convictions should be reversed. Thus, appellants raise an "as applied"[14] challenge to each of the three criminal statutes which underlie their convictions. *See* D.C.Code §§ 9–112(b)(5), (7), and 22–3102. They urge us to follow *Wheelock v. United States,* 552 A.2d 503 (D.C.1988), in which this court reversed the convictions of a group of fifty persons who had participated in a demonstration in the Capitol Rotunda.[15]

We agree that the application of these three criminal statutes to appellants' activities requires First Amendment scrutiny. *See Arshack v. United States,* 321 A.2d 845, 848 (D.C.1974). We are not persuaded, however, that any of the appellants' convictions violated the First Amendment as applied. *See id.*

## III.

It is well established in this jurisdiction that the United States Capitol Ro-

10. Lieutenant Hill estimated that the group occupied an area in the center of the Rotunda with a radius from the center of "approximately [twenty] feet" in the east and west directions and approximately "[thirty] feet" in the north and south directions. Lieutenant Hill testified further that the diameter of the Capitol Rotunda is ninety-five feet.

11. United States Capitol Police General Order No. 303.1 is a regulation promulgated pursuant to the unlawful entry statute. As summarized by the trial court in its instructions to the jury, it provides in pertinent part:

[N]o individual shall at any time sit, lie, or crouch down upon the floor of the Capitol Rotunda.

If any individual engages in that conduct as prohibited by this order and if that person when ordered by an officer to cease and desist from that conduct, ... fails or refuses to

do so, such individual shall be ordered to immediately leave the Capitol Rotunda.

12. None of the appellants who testified disputed the essence of Lieutenant Hill's testimony about what actually occurred.

13. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble, and to petition the [g]overnment for a redress of grievances." U.S. Const. amend. I.

14. See note 7, *supra.*

15. In *Wheelock, supra,* which this court decided after the trial in the present case, the demonstrators had been convicted of violating the unlawful entry statute, D.C.Code § 22–3102, which is one of three statutes at issue in this case.

tunda, which is at the very heart of the United States Capitol Building, is a "unique situs for demonstration activity" and "a place traditionally open to the public ... to which access cannot be denied broadly or absolutely...." *Wheelock, supra,* 552 A.2d at 506 (citations and internal quotes omitted). *See also Abney v. United States,* 616 A.2d 856, 859 n. 8 (D.C.1992) (quoting *Wheelock*). Nonetheless, content-neutral restrictions on the time, place, and manner of expression, such as the three statutes at issue in the present case, are permissible if they are "narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication." *United States v. Wall,* 521 A.2d 1140, 1143 (D.C.1987).

In cases involving demonstrations in the Capitol Rotunda, this court has imposed the "tourist standard" to save content-neutral statutes regulating the time, place, and manner of expression from unconstitutionality in their application. *See Markowitz v. United States,* 598 A.2d 398, 409 & n. 16 (D.C.1991), *cert. denied,* — U.S. ——, 113 S.Ct. 818, 121 L.Ed.2d 689 (1992) (citing and limiting the holding of *Wheelock, supra,* 552 A.2d at 508 n. 6 and citing *United States v. Nicholson,* 97 Daily Wash.L.Rptr. (June 19, 1969) (appended to *Dellums v. Powell,* 184 U.S.App.D.C. 275, 305, 566 F.2d 167, 197 (1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978)), *aff'd,* 263 A.2d 56 (D.C.1970)). *See also Reale v. United States,* 573 A.2d 13, 15 (D.C.1990) ("[T]he [tourist] standard ... is a means of determining if a statute, as applied in a particular case, is constitutional."). The "tourist standard" restricts the scope of statutes by penalizing only conduct that is "more disruptive or more substantial (in degree or number) than that normally engaged in by tourists and others and routinely permitted...." *Dellums, supra,* 184 U.S.App.D.C. at 313 n. 22, 566 F.2d at 205 n. 22. *See also Wheelock, supra,* 552 A.2d at 508 ("[Demonstrators'] conduct cannot constitute the basis for penalizing the exercise of their [First Amendment] rights unless it interferes with the rights of others to a greater degree than tourists do.").

This court's rationale for applying the tourist standard is three-fold. First, courts have a duty to construe statutes in a way which avoids declaring them unconstitutional. *See id.* at 508 (citing *Nicholson, supra,* 184 U.S.App.D.C. at 309–10, 566 F.2d at 201–02). Second, we adhere to the Supreme Court's instruction that the crucial inquiry in determining whether regulations of time, place, and manner of expressive conduct are reasonable is "whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Farina v. United States,* 622 A.2d 50, 56 (D.C.1993) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972)). Third, as this court said in *Wheelock:*

> A policy which results in the closing of the Rotunda when people exercise rights protected by the First Amendment, but in the Rotunda remaining open when such rights are not being exercised, penalizes and chills constitutionally protected activity....

*Id.* at 509 (quoting *United States v. Murphy,* 114 Daily Wash.L.Rptr. 2149, 2158 (October 20, 1986) (citation omitted)).

In applying the "tourist standard" to appellants' conduct which led to their convictions, we note, first, that the demonstrators gathered together in the center of the Rotunda and formed a large group of approximately 113 people. The record is clear that tourist groups, in contrast, are limited in number to a maximum of fifty—i.e., less than half as many. Second, the record reveals that by positioning themselves in the very center of the Rotunda, and both inside and outside of the stanchions, the demonstrators totally blocked pedestrian traffic from using the intersection of the two central passageways from the north entrance to the south entrance and from the east entrance to the west entrance of the Capitol Building. The record is also clear that when ordinary tourist groups stop in the center of the Rotunda and block passage, they, like appellants, are asked to move. The difference is that

tourist groups usually comply with such a request, whereas the demonstrators refused. Third, the record shows that unlike ordinary tourists, an estimated three-fourths of the demonstrators sat or lay down on the floor, displayed a large banner, and refused to stand up when informed that they were violating a building regulation and ordered to cease and desist. Fourth, the record shows that appellants and their fellow demonstrators, who participated in a mass responsive reading, were shouting louder than ordinary tourists and in unison.

Accordingly, we conclude that appellants' demonstration activities in the Capitol Rotunda on August 4, 1986, were clearly more disruptive and more substantial than the activities of ordinary tourists. Thus, we hold that the demonstration statute, D.C.Code § 9–112(b)(7), and the obstruction statute, D.C.Code § 9–112(b)(5) were constitutionally applied to appellants' conduct in the Rotunda.

▇▇▇ We must go beyond the "tourist standard" to determine the constitutionality as applied of the unlawful entry statute, which involved a quintessential public property in this case. We must also consider: "(1) [whether] a person lawfully in charge of the premises expressly order[ed] the [demonstrators] to leave, and (2) [whether], in addition to and independent of the evictor's wishes, there exist[ed an] additional specific factor establishing the [demonstrators'] lack of a legal right to remain." *O'Brien v. United States*, 444 A.2d 946, 948 (D.C.1982) (citations omitted). *See also United States v. Rothmeier*, 570 A.2d 811, 813 (D.C.1990).

Lieutenant Hill testified that he was in charge of the Capitol Rotunda at the time the demonstration occurred. The record is clear that Lieutenant Hill, using an amplifier, expressly ordered the demonstrators to leave after first advising them that they were in violation of a building regulation prohibiting sitting or lying down, ordered them to cease and desist, and asked them to stand, which they failed to do. Moreover, the trial court correctly instructed the jury that the demonstration statute, the

obstruction statute, or the Capitol police General Order No. 303.1, or any combination of them, could have satisfied the "additional specific factor" prong of the unlawful entry test. Thus, we hold that the unlawful entry statute, D.C.Code § 22–3102, was also constitutionally applied to appellants' conduct in the Rotunda.

The appellants' argument that we should follow *Wheelock, supra,* 552 A.2d 503, in reversing the trial court is also not persuasive. Although *Wheelock* was also a Capitol Rotunda demonstration case in which a group of demonstrators was convicted of unlawful entry under D.C.Code § 22–3102, it is clearly distinguishable from the present case. In *Wheelock,* neither the "tourist standard" nor the "additional specific factor" requirement was satisfied. The group of fifty demonstrators in that case was not more substantial than a group of ordinary tourists. In addition, there was no evidence that the presence of the *Wheelock* demonstrators, who, on a day when Congress was not in session, sat in a tight circle in the center of the Rotunda and prayed for a change of heart on the part of Congress and the Administration on the Gramm–Rudman bill, either obstructed passage or disrupted the legislating or tourism activities of the Capitol Rotunda. *See id.* at 507. Moreover, the Capitol Police in *Wheelock* never "notified the demonstrators that they were violating regulations which prohibited sitting down or obstructing passageways and asked them to desist in that violation [or to stand or move elsewhere]. Rather, the Capitol Police immediately closed the Rotunda and used [the closing itself] as a basis for making arrests for unlawful entry." *Id.* This court concluded that the *Wheelock* demonstrators' arrests were unlawful, reasoning that: "Closing the area for security reasons arising from the presence of the demonstrators cannot serve to bootstrap the security concern into an independent factor justifying their arrest." *Id.* at 509.

The Capitol Police in the present case followed precisely the steps we said they did not follow in *Wheelock.* Lieutenant Hill advised appellants that they were vio-

lating a building regulation which prohibited lying or sitting down, ordered them to cease and desist, and asked them to stand up. Only after the demonstrators refused to do so did the Chief of Police order the Rotunda closed and Lieutenant Hill and his fellow officers order the demonstrators, both collectively and individually, to leave, thus giving them an opportunity to demonstrate elsewhere,[16] or face arrest.

### IV.

Accordingly, the judgment on appeal is hereby

*Affirmed.*

---

**16.** As this court stated in *Farina, supra,* 622 A.2d at 59 n. 16: "we do not suggest, however, that ... demonstrators must be specifically told of an alternative forum." Although *Farina* was an obstruction case, we see no reason why this ruling should not apply here.