Eve L. TETAZ, et al., Appellants,

v.

DISTRICT OF COLUMBIA, Appellee.

Nos. 07–CT–140, 07–CT–141, 07–CT–262, 07–CT–271, 07–CT–272, 07–CT–273, 07–CT–284, 07–CT–285, 07–CT–410, 07–CT–434.

District of Columbia Court of Appeals.

Argued April 2, 2009.
Decided July 30, 2009.

---

Mark L. Goldstone, Washington, DC, appointed by the court, for appellants.

Max Obuszewski filed a brief, pro se.

Johnny Barber filed a brief, pro se.

Sidney R. Bixler, Assistant Attorney General, with whom Peter J. Nickles, Acting Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for appellee.

Before RUIZ and KRAMER, Associate Judges, and FARRELL, Senior Judge.

FARRELL, Senior Judge:

Following a bench trial, appellants were found guilty of offenses arising from their protest of the Iraq war on or near the grounds of the United States Capitol. Specifically, individual appellants were convicted of unlawful assembly [1] or unlawfully crossing police lines [2] during demonstrations at the Hart Senate Office Building, the Rayburn House Office Building, the Russell Senate Office Building, and the United States Capitol Building on successive days in September 2006. We affirm their convictions, summarizing the relevant facts as they pertain to each offense-situs and appellants' related arguments.

---

1. D.C.Code § 22–1307 (2001).

2. 24 DCMR § 2100.3 (1996).

## I.

### The Hart Senate Office Building (the "Hart Building")

Although appellants recount the evidence of the Hart Building demonstration and arrests in one or the other of their briefs, they make no argument challenging their convictions for unlawful assembly arising from that demonstration, so that any such challenge has been waived. *See, e.g., Ramos v. United States,* 569 A.2d 158, 162 n. 5 (D.C.1990). Nonetheless, because that evidence provides context for the actions of the United States Capitol Police in arresting them for the other violations, we summarize it briefly.

According to testimony that the trial judge credited, 300 to 350 people had gathered in the Upper Senate Park, an outdoor grassy area, on September 26 for a demonstration authorized by permit to protest the war in Iraq. U.S. Capitol Police Officer Galope testified that some fifty of these individuals then entered the Hart Building where, in the first floor atrium, they began "singing, and chanting, and reading ... very loudly." According to Galope, other persons in the atrium complained to the police about the volume of the noise. There were onlookers all the way up to the 8th floor of the atrium (some of whom, too, were "calling and complaining of the loudness"), and persons passing through the atrium had to move around the demonstrators. The trial judge found that, although the demonstration was not "loud," there "was some level of disruption" and "incommoding or blocking" of movement. Thus, he found it to be a "reasonable [exercise of] discretion" when the police, after giving three verbal warnings to the group to disperse, arrested those members who refused to do so.

## II.

### The Rayburn House Office Building (the "Rayburn Building")

■ Some of the appellants challenge their convictions for unlawful assembly arising from their actions the next day (September 27) at an entrance to the Rayburn Building.[3] They argue that the government failed to present sufficient evidence of (a) their intent to impede entry and (b) disorderly conduct on their part or circumstances likely to lead to a breach of the peace—the latter, they contend, a necessary element of proof under the First Amendment. On the contrary, appellants' purpose to impede entry was adequately shown, and the government was not also required to prove an actual or imminent breach of the peace.

In *Odum v. District of Columbia,* 565 A.2d 302, 304 (D.C.1989), we stated that conviction for unlawful assembly requires proof of two things: "(1) 'the presence of three or more persons acting in concert for an unlawful purpose' ...; and (2) commission of the [statutory] act ... alleged in the information" (quoting *Kinoy v. District of Columbia,* 130 U.S.App. D.C. 290, 299, 400 F.2d 761, 770 (1968) (unlawful assembly "requires both the assembly and the commission of one of the acts forbidden by the statute")). Here, the testimony fairly supporting an inference that the appellants had assembled in front of the Rayburn Building entrance intending to impede entry into the building as a protest was as follows:

> around any public building ... to crowd, obstruct, or incommode ... the free entrance into any public ... building...."

---

**3.** *See* D.C.Code § 22–1307, providing that, as relevant here:

It shall not be lawful for any person or persons ... to congregate and assemble ...

According to Captain Lloyd of the U.S. Capitol Police, when he arrived at the Rayburn Building in response to reports of a protest, he saw some twenty-five demonstrators lying in front of the Independence Avenue entrance to the building. The reclining individuals were "blocking [the entrance] completely" and occupying seventy percent of the "plaza area adjacent to the entrance." They had pulled white sheets over themselves and had lined up some fifteen mock coffins on the steps to represent victims of war. Lloyd testified that, because the demonstrators lay "right up against the … first entrance … to the building," persons entering had to "hop over" them to enter, while others—"diverted away from that entrance"—"went … around the corner to the South Capitol entrance." The trial judge found that, "while not 100 percent blocked, [the building entrance] was significantly impeded or incommoded" because "people had to pick their way around individuals lying on the ground in sheets," some "less than two or three feet … from the entryway."

Appellants' argument that the government showed no intent on their part to impede the entrance, *see Odum, supra,* 565 A.2d at 302, is without merit. Lloyd testified that the protesters had been told three times that "they were in violation of the Capitol regulations and that if they didn't leave the area *or unobstruct the door* … they'd be arrested" (emphasis added). Given these warnings and the obvious inference to be drawn from the appellants' lying up against the doorway, they cannot compare themselves to the protesters in *Odum,* who while "mov[ing] back and forth across [a] driveway, … always moved aside to allow traffic to enter," 565 A.2d at 304, thus evincing a non-obstructive purpose.

■ Nor was the government obliged to prove that appellants were otherwise "disorderly" or that their actions threatened to cause a breach of the peace.[4] Purposely blocking or impeding entry into a public building enjoys no First Amendment protection, certainly none sufficient to require proof of an imminent breach of the peace before persons who refuse warnings to desist may be punished. In *Green v. City of Raleigh,* 523 F.3d 293, 302 (4th Cir. 2008), for example, the court upheld an ordinance clause intended "to prevent picketers from 'block[ing] the entrance to a building or people's egress into or out of the building.'" The court explained:

> The Supreme Court has upheld a similar statute that prohibited picketing "in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any public premises." *Cameron v. Johnson,* 390 U.S. 611, 612 n. 1, 617, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). Such a provision imposes *no* burden on speech. As the *Johnson* Court explained, such a provision "does not abridge constitutional liberty," since obstructing pedestrian access to city or state facilities "bears no necessary relationship to the freedom to … distribute information or opinion." *Id.* at 617, 88 S.Ct. 1335 (internal quotation marks omitted)….

*Id.* at 302–03 (emphasis in original). *See also Cox v. Louisiana,* 379 U.S. 536, 554–55, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (pointing out that "[g]overnmental authorities have the duty … to keep their streets open and available for movement," and that "[a] group of demonstrators could not insist upon the right to cordon off … [an] entrance to a public or private building, and allow no one to pass who did not agree

---

4. Another portion of § 22–1307 does punish assembling to "engage in … disorderly conduct," and D.C.Code § 22–1321 (2001) punishes various acts intended or likely "to provoke a breach of the peace," but appellants were not tried for violating those provisions.

to listen to their exhortations"); *Edwards v. South Carolina*, 372 U.S. 229, 231–32, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (reversing convictions for breach of peace on State House grounds, but noting that "[t]here was no obstruction of pedestrian or vehicular traffic"); *Arbeitman v. District Court of Vermont*, 522 F.2d 1031, 1034 (2d Cir. 1975) ("A state may properly legislate to prevent persons from blocking sidewalks and obstructing traffic," citing *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), "and demonstrators may not insist upon the right to cordon off a street or entrance to a public building," citing *Cox*, 379 U.S. at 555, 85 S.Ct. 453; "[t]his significant governmental interest justifies legislation aimed only at physical obstruction, a result of body or objects, intended to cause public inconvenience.").

Thus, proof of a real or threatened breach of the peace before assembling meant to block or impede entry to a building may be punished is not required by the First Amendment, and would be an unreasonable limitation on police authority to keep entrances "open and available for movement." *Cox, supra*, 379 U.S. at 555, 85 S.Ct. 453. It cannot be, we think, that the police constitutionally had to await a fist fight or threats of violence sparked by the inconvenience to persons having to step over demonstrators before they could order the defendants to free the entryway to the Rayburn Building or be arrested. Appellants nevertheless argue that two prior decisions, *Williams v. District of Columbia*, 136 U.S.App. D.C. 56, 419 F.2d 638 (1969), and *Adams v. United States*, 256 A.2d 563 (D.C.1969), require the gov-

ernment to prove a breach of the peace. *Williams*, however, added that proof requirement to the disorderly conduct statute as applied to a case of speech only—the utterance of profane or obscene language in a public place. 136 U.S.App. D.C. at 63, 419 F.2d at 645.[5] It thus has no relevance to the deliberate obstructing of entry to a building punished by the unlawful assembly statute in this case. And *Adams*, though applying the unlawful assembly statute at issue here, did so to facts—undescribed in the opinion—that apparently included no blocking of a building entrance, much less a purpose to impede entry. What concerned the court, in adopting *Williams'* breach-of-peace requirement on the facts before it, was the hypothetical "punishment of the members of a group of sightseers, tourists, or school children, who might innocently congregate and assemble on a public street in such a manner as to crowd, obstruct, or incommode the free use of the street." *Adams*, 256 A.2d at 564–65. That potential, and the corresponding limitation the court read into the statute, has no bearing on application of the unlawful assembly statute to punish the deliberate impeding of entry into a public building, as here.

### III.

### The Russell Senate Office Building (the "Russell Building")

On September 26 (the day before the Rayburn Building arrests), a group of some fifty demonstrators had entered the Hart Senate Office Building and demonstrated there, as described earlier. Simul-

---

**5.** The government, the court observed, "appears to have no legitimate interest in punishing a person simply because he has uttered, out of the presence of anyone else, some words which might be considered 'obscene' or 'profane.'" *Id.; see also id.* at 62, 419 F.2d at 644 (without such a proof require-ment, the "indecent or obscene words" portion of the disorderly conduct statute "is on it[s] face extraordinarily broad, so broad ... that it would allow punishment of the hapless stonemason who, after crushing his toe, innocently utters a few relieving expletives within earshot of a public place.").

taneously therewith (or shortly afterwards), as many as 350 demonstrators marched eastward along the south face of the Russell Building, approaching First Street, N.E. Lieutenant Peter Demas of the Capitol Police instructed a motor unit to establish a police line of six or seven officers near the corner, blocking the steps that led into the building and the sidewalk from the steps to the curb of Constitution Avenue. Demas's "primar[y]" concern was "public safety, ... includ[ing] ... safety of ... people inside the building and the members [of Congress] ... until we could determine exactly what was going on."[6] At the same time, all other entrances to the building remained open, and Demas testified that if individual protesters had told him they desired to visit their Senators, he would have directed them to those entrances. Several demonstrators, including three of the appellants, crossed the police line nonetheless, and were arrested as they walked up the steps toward the southwest door of the Russell Building.

As relevant here, the police-line regulations provide that when "parades ... or other occasions ... may cause persons to collect on the public streets, ... the Chief of Police ... or an officer acting for him or her may establish an area or zone that he or she considers necessary for the purpose of affording a clearing for ... (c) [t]he movement of traffic ... [and] (e) [t]he protection of persons and property." 24 DCMR § 2100.1. "No person shall enter the emergency area of zone unless duly authorized by the person in command of the emergency occasion...." *Id.* at § 2100.3.

Appellants argue first that, as a matter of statutory (or regulatory) interpretation, the situation here did not call for the "emergency" measure of a police line, and

thus that the police could not bar them from crossing the line. They also argue that the police line was not, in the circumstances, a permissible "time, place, and manner" restriction on expression protected by the First Amendment. The arguments, plainly interrelated, do not convince us.

 "[W]here the First Amendment is implicated, the constitutionality of [the police-line] regulation and its application must be measured by the principles and legal standards pertaining to government regulations of speech." *Bloch v. District of Columbia,* 863 A.2d 845, 849 (D.C.2004). The District, as appellee, does not dispute that the place where the defendants were stopped by the police line—*i.e.,* the sidewalk in front of the Russell Building—is a "public forum." *See, e.g., Lederman v. United States,* 351 U.S.App. D.C. 386, 391–94, 291 F.3d 36, 41–44 (2002) (sidewalk at foot of House Senate steps and near Capitol Building is a traditional public forum). "Where ... speech occurs in traditional public fora, government regulation must be narrowly tailored to serve a significant public interest and must leave open alternative means and methods of communication." *Bloch,* 863 A.2d at 849 (citing, *inter alia, United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)). Such "reasonable regulation[ ]" must be "unrelated to the content of the [speaker's] message." *Id.* (internal citation omitted).

 Appellants do not seriously argue, and the record would not support a claim, that the police line was set up because of the reasons for or the message of their protest. Instead, they take issue with the need for police action barring their further movement eastward along the sidewalk in front of the Russell Build-

---

**6.** A secondary concern was that a large construction site extended onto Constitution Avenue; Demas was afraid that so large a group

of demonstrators could not safely navigate the sidewalk through the construction area.

ing. The police, however, acting at the direction of Lieutenant Demas who was in charge at that building, concluded that a procession of some 100 people (part of the much larger group that had assembled in the Upper Senate Park) who appeared intent on reaching the steps of and likely entering the Russell Building posed a danger to the security of the building and the ability of Senate members and their staffs to conduct business in a structure designated—as its name makes clear—as an office building. That the police had reason to believe the protesters, or a sizeable number of them, would seek to enter the building and continue their demonstration there is shown by the contemporaneous actions (at the same time or shortly before) of the protesters who had entered the nearby Hart Building and engaged there in "singing, and chanting and reading ... very loudly." [7]

▮ Appellants cite no authority for deeming the interior of Senate or House Office Buildings equivalent to the Rotunda of the Capitol Building itself, which we have termed a "unique situs for demonstration activity." *Berg v. United States,* 631 A.2d 394, 398 (D.C.1993) (quoting *Wheelock v. United States,* 552 A.2d 503, 506 (D.C.1988)). The former are buildings where, quintessentially, congressional members "carry out the duties of office" and are entitled to "transact ... business in an orderly manner without interference." *Markowitz v. United States,* 598 A.2d 398, 405 (D.C.1991). The Russell Building, therefore, is a situs where the Capitol Police may enforce, without First Amendment objection, the prohibition of D.C.Code § 10–503.16(b)(7) (2001) against "parad[ing], demonstrat[ing], or picket[ing] within any of the Capitol Buildings."

▮ Nor, in the circumstances here, were the police obliged to await a foreseeable entry of the building by demonstrators before intervening. A government limitation on expressive activity does not fail because "the decision-maker could have developed an alternative measure" less restrictive, so long as the means chosen are reasonable in context. *Abney v. United States,* 616 A.2d 856, 859 (D.C. 1992); *see id.* at 861 (the government "is not required to await actual harm before enforcing a regulation such as [the] Order" at issue there). Because the protestors here had signalled an intent to carry the demonstrations inside by their conduct at the Hart Building, the police could reasonably act so as to head off a similar occurrence at the Russell Building. Moreover, the police line blocked only one entrance to the building. Some demonstrators testified that they were kept from visiting their Senator, but any one of them could have walked a short distance to another entrance to the building to do so. Lieutenant Demas in fact met with protesters and tried to work out a way for them to visit their Senators "and continue what they wanted to do [in keeping] with their First Amendment rights." His actions thus were in accord with the court's observation in *Abney* that the defendant (whose conviction we upheld there for demonstrating under the steps of the Capitol Building despite a closure order) could have contin-

---

7. It does not matter that the particular officers on duty at the Russell Building may not have known of the activity inside the Hart Building. In a case concerning "a fast-moving sequence of events involving a number of law enforcement officers at several different locations," this court applies the doctrine of collective knowledge in deciding whether police action was justified. *McFerguson v. United States,* 770 A.2d 66, 72–74 (D.C.2001) (internal citation omitted). There is no good reason why the doctrine ought not to apply also to Capitol Police officers monitoring simultaneous demonstrations by large groups of people.

ued his protest at other parts of the Capitol grounds, including some suggested by the police. *Id.* at 862.[8]

■ Preventing "disrupt[ion of] the orderly conduct of the legislature's business" is a substantial governmental interest. *Smith–Caronia v. United States,* 714 A.2d 764, 766 (D.C.1998). Because the police reasonably foresaw actions by the protestors inside the Russell Building that are "incompatible with the normal activity of [that] place," *Berg, supra,* 631 A.2d at 398 (internal citation omitted), the decision to set up a police line outside the entrance while leaving open alternative means for protestors to convey their message was reasonable—a measure "not substantially broader than necessary." *Abney, supra,* 616 A.2d at 860 (internal citation omitted). Appellants' convictions for crossing the police line there must stand.

## IV.

### The United States Capitol Building

■ Finally, we affirm the convictions of appellants for crossing the police line outside the Capitol Building, although the question of whether that measure trenched too closely on protected activity is a closer one.

Captain Lloyd testified that on September 26 a group of the demonstrators who had assembled in the Upper Senate Park left that area and marched westbound on Constitution Avenue down the hill, then turned left on First Street, N.W. and moved south toward the west front of the Capitol Building. When the police set up a police line "to stop [the] demonstrators from going too far [toward] the Capitol where [the group] could interfere with other activities of the Capitol," the marchers "l[eft] the area" and continued walking south across the west front until they reached the Maryland Avenue walkway leading to the Capitol Building. As they ascended the walkway, the police set up a second line after having offered the marchers (on recommendation of on-scene attorneys from the General Counsel's Office) a new permit "to demonstrate on the [grassy area] on the west front," an offer the demonstrators spurned. Lloyd ordered the second police line in order to prevent the marchers from getting "close to the Capitol for safety reasons and . . . to let the Congress complete their mission." The group of demonstrators numbered from 50 to 100,[9] who were chanting and singing and carrying a coffin, but were "peaceful." The second police line was set up "[p]robably 100 yards" from the Capitol Building and was designed to bar access to the narrow west terrace of the Capitol, an area the police also wished to keep clear "for evacuation routes" from the building.[10]

---

**8.** This prosecution does not have the defect that we identified in *Bloch, supra,* where "the only evidence presented by the government to justify its establishment of [a] police-line [in front of the White House] was . . . hearsay and speculative testimony" as to need. 863 A.2d at 851. In the absence of "competent, admissible testimony . . . to show that the restriction on expressive activity was narrowly tailored to serve a significant governmental interest," we reversed the defendant's conviction for crossing the police line. *Id.* Here, by contrast, Lieutenant Demas, who was the officer in charge at the Russell Building, testified that he ordered the line established and explained why he believed that necessary—

including the need to protect the security of persons, · such as congressional members, working in the building.

**9.** From the transcript it is not wholly clear whether this number referred only to demonstrators, and did not also include bystanders.

**10.** "When I make a decision to set up a police line," Lloyd stated, "I've taken into consideration . . . public egress . . . if there's an evacuation[;] I have to have routes clear, . . . plus if a demonstrating group is too close to the building, they disturb the Congress from completing its mission, its obligation."

Another reason for the police line was simply that the marchers had exceeded the bounds of their authorized assembly and were now "engaged in demonstration activity ... without a permit." When some fifteen marchers crossed through the police line, they were arrested.

In *Abney, supra,* this court recognized that the government's interest in "protect[ing] the perimeters" of the Capitol Building is a substantial one when "circumstances" so dictate. 616 A.2d at 860. The special circumstances in *Abney* were "increased security concerns created by the [then] Persian Gulf crisis and potential threats of terrorist activities as a result of it," *id.* at 857, and we accordingly sustained, against an as-applied First Amendment challenge, an interim regulation by the Capitol Police that effectively barred all expressive activity on or near the Capitol Building steps except for nearby grassy-area locations. *See id.* at 858–62. This, we said, served the valid governmental interest of "restricting the access of all individuals to a specific perimeter during the Gulf War crisis in order to monitor and control potential threats to the security of the building and its users," as well as to "keep[ ] evacuation routes clear." *Id.* at 861, 862.

Although the District does not point out the fact, it is evident to any observer that the Capitol Police have likewise adopted, and employ, enhanced security measures around the perimeter of the Capitol Building (indeed, around the entire U.S. Capitol complex) since the events of September 11, 2001. No one can reasonably dispute the legitimacy of such measures in general, and appellants do not do so. They argue, however, that the police action in this case amounted to establishment of a 100–yard (or "football field" length) cordon around the entire Capitol Building within which even peaceful demonstrations are banned, and that the justifications offered by Captain Lloyd—unconfirmed by any police regulations or general orders offered into evidence—for barring their movement as protestors in that area are too weak to support so broad a restriction on First Amendment activity.

We are not shy to say that the challenged police line gives rise to constitutional concern. First, as indicated, although Captain Lloyd explained his decision to order the police line, the prosecution did not present the trial court with any regulation announcing a general policy of the Capitol Police to bar demonstrative activity within a broad perimeter of the Capitol Building of the kind drawn here. The presence of such a regulation or general order has been deemed important in the analogous context of prosecutions for unlawful entry (or refusal to leave on demand), where the court has required "some additional specific factor" supporting an official's order to leave, and has found it in general orders such as the proscription we upheld in *Abney.* 616 A.2d at 859 (internal citation omitted). Furthermore, as recently as 2002, the federal Circuit Court struck down as unconstitutional a Capitol Police Board regulation banning all leafleting and other "demonstration activit[ies]" on the sidewalk at the foot of the House and Senate steps on the East Front of the Capitol Building, holding "that no part of the ban is narrowly tailored to further a significant governmental purpose." *Lederman, supra,* 351 U.S.App. D.C. at 389, 291 F.3d at 39.[11] Appellants argue,

---

11. *Lederman,* it is true, concerned a demonstration in 1997, well before the events of September 11, 2001.

with some force, that if a ban against peaceful protests on the sidewalk at the foot of the Capitol Building steps is constitutionally infirm, then the police action in refusing to let them carry a peaceful protest closer to the Capitol Building than 100 yards similarly cannot be said to be a narrowly tailored restriction, and that they were thus free to ignore it without fear of criminal prosecution.

We conclude, nevertheless, that the police line was a lawful restriction on First Amendment rights in the circumstances of this case. Viewed in its context, appellants' procession was one of three more or less simultaneous actions by sizeable groups of protesters who had ignored the limits of the permit they had received to demonstrate in Upper Senate Park. As we have seen, one group carried their protest into the Hart Building and a second group appeared intent on a similar demonstration inside the Russell Building. The police thus had reason to believe that the third group too planned—in appellant Barber's word in his brief on appeal—to "access" the Capitol Building as the best means of disseminating their message. This supposition that appellants would not be content to remain outside the building was strengthened when they rejected the offer of police (and government attorneys) on the scene to let them demonstrate nearer the Capitol Building than their original permit had allowed.

Although it was not the subject of much testimony at trial, the Capitol Police have adopted a content-neutral permit process allowing demonstration activity on the Capitol grounds subject to time, place and manner limitations. *See* U.S. CAPITOL POLICE, CONDUCTING AN EVENT ON UNITED STATES CAPITOL GROUNDS, http://www.us capitolpolice.gov/special_events/ guidelines_app_page.pdf (revised June 2009). Appellants availed themselves of this process initially; they did not, that is to say, challenge *ex ante* as an unconstitutional prior restraint the geographical limitations placed on their permission to assemble. Indeed, considering the testimony of one defendant at trial that all the protesters wished to do outside the Capitol Building was lay a coffin on the west front steps as a symbolic gesture, it is not apparent that they would have been denied a permit for that activity had they applied for it in advance. But, instead, what the Capitol Police faced was a procession of up to 100 persons, the end-point of whose march they could not be sure of and whose actions of carrying a coffin and singing and chanting they could reasonably believe would take the marchers into the interior of the Capitol—the Rotunda, if not further—where the resultant disruption would foreseeably exceed the limits of the so-called "tourist standard." *See Wheelock, supra,* 552 A.2d at 508. ("[A]ppellants' conduct cannot constitute the basis for penalizing the exercise of their constitutional rights unless it interfered with the rights of others to a greater degree than tourists do.") (internal citation omitted).

The issue thus resolves itself, in our view, to whether the Capitol Police were bound to adopt less restrictive measures than they did in blocking appellants' advance by establishing the police line at, say, twenty yards from the Capitol Building or at the foot or the top of the building steps. The trial judge believed that this decision must be left to the reasonable judgment of the officers on the scene, and we agree. As we stated in *Abney, supra,* "[t]he idea that courts should ... second-guess[ ] the responsible authorities about how a legitimate governmental interest might have been achieved better has been rejected explicitly by the Supreme Court." 616 A.2d at 860 (citing *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 299, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)); *see*

*also Shiel v. United States*, 515 A.2d 405, 408 (D.C.1986) ("Even if a more appropriate response to the situation could have been formulated, ... the validity of the ... order does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests.") (internal citation and quotation marks omitted).

In sum, the judgment of the police officers that appellants' progression, as part of a sizeable group of demonstrators whose actions could foreseeably disrupt the congressional business, should be blocked at the point the police selected was a reasonable limitation that did not unduly restrict their right to disseminate their message. This case is not *Lederman, supra*, where the police applied a uniform ban "to a lone visitor [and leafletter] to the Capitol Grounds," 351 U.S.App. D.C. at 389, 291 F.3d at 39, and had in place no permit process authorizing demonstrations on the grounds subject to reasonable size and other limitations. *Id.* at 396, 291 F.3d at 46. Appellants' convictions for crossing the police line outside the Capitol Building must stand.

*Affirmed.*

1. Appellants raise for the first time on appeal that the information failed to "sufficiently apprise the accused of the charge against him so he may properly prepare his defense." *Horowitz v. District of Columbia*, 291 A.2d 202, 203 (D.C.1972). Appellants were charged by an information that quoted the statute, but did not specify the conduct for which they were being charged:

> UNLAWFUL ASSEMBLY: did congregate and assemble in any street, avenue, alley, road, or highway, or in or around any public building or inclosure, or any park or reservation, or at the entrance of any private building or inclosure, and engage in loud and boisterous talking or other disorderly conduct, or insult or

RUIZ, Associate Judge, dissenting in part.

I would reverse the conviction for unlawful assembly on the steps of the Rayburn House Office Building because binding precedent requires that the government prove not only that the protesters have incommoded or obstructed the entrance to the building, but also that they have engaged in, or threatened, a breach of the peace. *See Adams v. United States*, 256 A.2d 563, 564 (D.C. 1969) (citing *Williams v. District of Columbia*, 136 U.S.App. D.C. 56, 64, 419 F.2d 638, 646 (1969)). Appellants were not charged with breaching the peace,[1] the government did not present evidence of breach of the peace, and the trial court made no such finding. Rather, and as the majority acknowledges, the trial judge noted that "there was no contrary evidence to the assertion that it was a peaceful demonstration ... respectfully carried out as a means of expression." The judge found that the appellants' protest

> clearly block[ed] a series of doors [on the Independence Avenue side of the Rayburn Building], 70 percent, even though it doesn't physically prevent anyone from walking in, does incommode.

> make rude or obscene gestures or comments or observations on persons passing by, or in their hearing, or to crowd, obstruct, or incommode, the free use of any such street, avenue, alley, road, highway, or any of the foot pavements thereof, or the free entrance into any public or private building or inclosure, in violation of D.C.Code § 22–1307 (2001).

Because the insufficiency of the information was not raised at trial, we would reverse on that ground only if there is "demonstrable prejudice," *Craig v. United States*, 490 A.2d 1173, 1176 (D.C.1985), which appellants, who challenge their convictions on First Amendment grounds, have not shown.

Again there's no question that those who were arrested were there and were in front of the doorways and didn't leave when they were instructed to. So the ... question is this; was this a violation of the statute [that] could pass constitutional scrutiny? And in the court's view it was; clearly they could seek to keep the access clear.

The presence of the coffins was not the subject of arrest. It was those lying up in the, right at the entry level. And that does strike me as an area that police could reasonably seek to keep clear. And so I find these defendants guilty.

The evidence adduced at trial showed that some of the protesters, "[a]pproximately 20 or so," according to Captain Thomas Lloyd, were lying close to the entrance of the building. As a result, he testified, although "a couple persons were successful" in getting into the building, "[m]ost, the other people did choose to go to another entrance." Captain Lloyd testified that he "didn't physically see somebody approach [the entrance to the building] and who was unsuccessful. I did see people avoid the area based on the people line, you know, along the doorways." Some persons entering or leaving the Rayburn building had to "walk over" or "hop" over the protesters who were lying down pretending to be casualties of war, with sheets over them. The trial judge explicitly commented that there had been no breach of the peace, stating that "one of

the things that has characterized these cases is that clearly everyone involved was conducting themselves with courtesy and respect for each other which maximizes the value of the speech and the demonstration and minimizes the relevant conflict." In my opinion, under circumstances where there has been no actual or threatened breach of the peace, the conviction cannot stand.[2]

What the evidence here shows, consistent with the trial judge's remarks, is that appellants' war protest was taken in stride by the people entering and leaving the Rayburn Building, who went about their business by, at most, making slight alterations such as by "walking over" the demonstrators or choosing to use another entrance. That this was so is not surprising because notwithstanding the belief expressed by Captain Lloyd that police intervention was necessary to "let Congress complete their mission," the "mission" of members of Congress and of many persons who visit the Capitol routinely includes intense and sometimes even heated dialogue about issues of policy that affect the Nation. Whether our country should be at war is one of the issues that historically has compelled citizens to petition the Congress and mount demonstrations in and around the Capitol.

In *Williams*, the U.S. Court of Appeals for the District of Columbia interpreted the section of the disorderly conduct statute which makes it unlawful for "any person ... to curse, swear, or make use of

2. After the entrance to the Rayburn Building was described to Captain Lloyd as having "an outer entrance and then you go in there's like a little alcove, then there's an actual entrance to the building," he testified that the protesters were lined up "against the first ... entrance as you described it, to the building." This would have been the "outer entrance" and not the "actual entrance" to the Rayburn Building. The majority quotes Captain Lloyd's testimony from an earlier proceeding

that the demonstrators were lying "right at the doors, actually you know, blocking the doors" and consequently, "the entrances they were blocking completely." This testimony, however, was inconsistent with Captain Lloyd's observation that several people *did* enter the building during the demonstration. The trial judge found that persons were *not* "physically prevented" from entering the building.

any profane language or indecent or obscene words, or engage in any disorderly conduct, in any street...." D.C.Code § 22–1307 (2001), *formerly* D.C.Code § 22–1107 (1981);[3] *see Williams*, 136 U.S.App. D.C. at 59, 419 F.2d at 641. Because "of the serious constitutional problems posed by a notably broad statute regulating speech," *Williams*, 136 U.S.App. D.C. at 62, 419 F.2d at 644, the court held that the statute "could be validly applied only if it were construed to require something more than simply the utterance of profane or obscene language in a public place." *Id.* at 63, 419 F.2d at 645. The "something more", was the added requirement that the objectionable language "be spoken in circumstances which threaten a breach of the peace." *Id.* at 64, 419 F.2d at 646. The majority distinguishes *Williams* on the ground that it involved pure speech, and not conduct—a distinction that finds validity in First Amendment jurisprudence. *See Cox v. Louisiana*, 379 U.S. 559, 564, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (noting that "the fact that free speech is intermingled with [regulated] conduct does not bring with it constitutional protection"). But that distinction was made untenable by this court's decision in *Adams*, which, following *Williams*, also narrowly interpreted the specific section of the statute at issue here, which makes it unlawful "to congregate and assemble in any street, ... or in or around any public building, ... and engage in loud and boisterous talking or other disorderly conduct, ... or to crowd, obstruct or incommode, the free use of any such street, ... or the free entrance into any public or private building...."[4]

3. Section 22–1307, which was enacted in 1892, has been described as a "disorderly conduct statute which was not at its birth a model of craftsmanlike drafting and which has certainly not improved with age." *Williams*, 136 U.S.App. D.C. at 59, 419 F.2d at 641. The statute provides in full:

It shall not be lawful for any person or persons within the District of Columbia to congregate and assemble in any street, avenue, alley, road, or highway, or in or around any public building or inclosure, or any park or reservation, or at the entrance of any private building or inclosure, and engage in loud and boisterous talking or other disorderly conduct, or to insult or make rude or obscene gestures or comments or observations on persons passing by, or in their hearing, or to crowd, obstruct, or incommode, the free use of any such street, avenue, alley, road, highway, or any of the foot pavements thereof, or the free entrance into any public or private building or inclosure; it shall not be lawful for any person or persons to curse, swear, or make use of any profane language or indecent or obscene words, or engage in any disorderly conduct in any street, avenue, alley, road, highway, public park or inclosure, public building, church, or assembly room, or in any other public place, or in any place wherefrom the same may be heard in any street, avenue, alley, road, highway, public park or inclosure, or other building, or in any premises other than those where the offense was committed, under a penalty of not more than $ 250 or imprisonment for not more than 90 days, or both for each and every such offense.

D.C.Code § 22–1307.

I note that in light of numerous state statutes similar to the one we have regularly had to struggle with in the District of Columbia, the Model Penal Code has sought to "systematize the chaotic provisions of prior law penalizing a wide variety of petty misbehavior under such vague headings as 'disorderly conduct' or 'vagrancy'; [and] to safeguard civil liberty by careful definition of offenses so that they do not cover, for example, ... peaceful picketing, or disseminating religious or political views." MODEL PENAL CODE § 250.1 explanatory note (1981); *see id.* § 250.2 (disorderly conduct); *id.* § 250.7 (obstructing highways and other public passages).

4. I disagree with the majority's characterization that evidence "fairly support[s] an inference that the defendants had assembled in front of the Rayburn Building entrance intending to impede entry into the building." As quoted above, the trial court found only

D.C.Code § 22–1307; *see Adams*, 256 A.2d at 564. In *Adams*, the court did not refer to the defendants' actions as an exercise of the right to free speech as there was in *Williams;* rather, as far as can be gleaned from the sparse discussion, the court was addressing a situation where defendants were "congregat[ing] and assembl[ing] on a public street and crowd[ing], obstruct[ing] or incommod[ing] the free use of such street." 256 A.2d at 564. In my view, the decision in *Adams* controls the outcome in this case, and requires reversal of appellants' convictions relating to the demonstration on the steps of the Rayburn House Office Building.

Even if *Adams* could be meaningfully distinguished—and I do not believe that it can be—the majority's attempt at doing so causes further concern. The purpose and place of appellants' conduct are critical. Unlike in *Adams*, where there is no suggestion that the location of the street that was blocked, or the circumstances surrounding the obstruction, were in any way related to expressive conduct, whatever "incommoding" occurred here took place at the Nation's principal public forum, and was incidental to a public display of expressive conduct ("political theater") intended for members of and visitors to the United States Congress. *See Lederman v. United States*, 351 U.S.App. D.C. 386, 391–94, 291 F.3d 36, 41–44 (2002) (recognizing that areas surrounding the Capitol are traditional public fora). The majority's attempt to distinguish *Adams* on the ground that what concerned the court there was the possible application of the disorderly conduct statute to punish students or sightseers who "innocently congregate and assemble on a public street" even if they do so "in such a manner as to crowd, obstruct, or incommode" the public's use,

256 A.2d at 565, means that police action that could be justified as neutral regulation of conduct is being unequally applied to persons exercising their First Amendment rights, but not to tourists. That, it is clear, the District may not do, whether the distinction is explicitly in the language of the statute, or in a gloss supplied by court interpretation, or a practice employed by regulatory authorities. *See Wheelock v. United States*, 552 A.2d 503, 508 (D.C. 1988) ("Appellants' conduct cannot constitute the basis for penalizing the exercise of their constitutional rights unless it interfered with the rights of others to a greater degree than tourists do."); *Cox*, 379 U.S. at 557, 85 S.Ct. 453 ("The pervasive restraint on freedom of discussion by the practice of authorities under the statute is not any less effective than a statute expressly permitting such selective enforcement."); *see also Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) ("A statute can be impermissibly vague ... if it authorizes or even encourages arbitrary and discriminatory enforcement.").

Because we are bound, as a division, to follow our *Adams* precedent, *see M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971), I would reverse appellants' conviction based on their demonstration on the steps of the Rayburn House Office Building. If the full court wishes to reexamine the question, it may do so *en banc.*

---

that appellants conducted a "peaceful demonstration" and acted "respectfully," but did not leave "when they were instructed to do so."

The trial court did not find that they assembled at the Rayburn House Office Building "intending" to impede entry.